# CHEVRON U. S. A. INC. *v.* NATURAL RESOURCES DEFENSE COUNCIL, INC., ET AL.

No. 82–1005.   Argued February 29, 1984—Decided June 25, 1984*

---

*Together with No. 82–1247, *American Iron & Steel Institute et al.* v. *Natural Resources Defense Council, Inc., et al.;* and No. 82–1591, *Ruckelshaus, Administrator, Environmental Protection Agency* v. *Natural Resources Defense Council, Inc., et al.,* also on certiorari to the same court.

838

*Deputy Solicitor General Bator* argued the cause for petitioners in all cases. With him on the briefs for petitioner in No. 82–1591 were *Solicitor General Lee, Acting Assistant Attorney General Habicht, Deputy Assistant Attorney General Walker, Mark I. Levy, Anne S. Almy, William F. Pedersen,* and *Charles S. Carter. Michael H. Salinsky* and *Kevin M. Fong* filed briefs for petitioner in No. 82–1005. *Robert A. Emmett, David Ferber, Stark Ritchie, Theodore L. Garrett, Patricia A. Barald, Louis E. Tosi, William L. Patberg, Charles F. Lettow,* and *Barton C. Green* filed briefs for petitioners in No. 82–1247.

*David D. Doniger* argued the cause and filed a brief for respondents.†

JUSTICE STEVENS delivered the opinion of the Court.

In the Clean Air Act Amendments of 1977, Pub. L. 95–95, 91 Stat. 685, Congress enacted certain requirements appli-

---

†Briefs of *amici curiae* urging reversal were filed for the American Gas Association by *John A. Myler;* for the Mid-America Legal Foundation by *John M. Cannon, Susan W. Wanat,* and *Ann P. Sheldon;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robin L. Rivett.*

A brief of *amici curiae* urging affirmance was filed for the Commonwealth of Pennsylvania et al. by *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Thomas Y. Au, Duane Woodard,* Attorney General of Colorado, *Richard L. Griffith,* Assistant Attorney General, *Joseph I. Lieberman,* Attorney General of Connecticut, *Robert A. Whitehead, Jr.,* Assistant Attorney General, *James S. Tierney,* Attorney General of Maine, *Robert Abrams,* Attorney General of New York, *Marcia J. Cleveland* and *Mary L. Lyndon,* Assistant Attorneys General, *Irwin I. Kimmelman,* Attorney General of New Jersey, *John J. Easton, Jr.,* Attorney General of Vermont, *Merideth Wright,* Assistant Attorney General, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Maryann Sumi,* Assistant Attorney General.

*James D. English, Mary-Win O'Brien,* and *Bernard Kleiman* filed a brief for the United Steelworkers of America, AFL–CIO–CLC, as *amicus curiae.*

cable to States that had not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation. The amended Clean Air Act required these "nonattainment" States to establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for a new or modified major stationary source unless several stringent conditions are met.[1] The EPA regulation promulgated to implement this permit requirement allows a State to adopt a plantwide definition of the term "stationary source."[2] Under this definition, an existing plant that contains several pollution-emitting devices may install or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the total emissions from the plant. The question presented by these cases is whether EPA's decision to allow States to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble" is based on a reasonable construction of the statutory term "stationary source."

I

The EPA regulations containing the plantwide definition of the term stationary source were promulgated on October

---

[1] Section 172(b)(6), 42 U. S. C. § 7502(b)(6), provides:
"The plan provisions required by subsection (a) shall—

.          .          .          .          .

"(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173 (relating to permit requirements)." 91 Stat. 747.

[2] "(i) 'Stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Act.

"(ii) 'Building, structure, facility, or installation' means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel." 40 CFR §§ 51.18(j)(1)(i) and (ii) (1983).

14, 1981. 46 Fed. Reg. 50766. Respondents[3] filed a timely petition for review in the United States Court of Appeals for the District of Columbia Circuit pursuant to 42 U. S. C. § 7607(b)(1).[4] The Court of Appeals set aside the regulations. *National Resources Defense Council, Inc.* v. *Gorsuch*, 222 U. S. App. D. C. 268, 685 F. 2d 718 (1982).

The court observed that the relevant part of the amended Clean Air Act "does not explicitly define what Congress envisioned as a 'stationary source, to which the permit program . . . should apply," and further stated that the precise issue was not "squarely addressed in the legislative history." *Id.*, at 273, 685 F. 2d, at 723. In light of its conclusion that the legislative history bearing on the question was "at best contradictory," it reasoned that "the purposes of the nonattainment program should guide our decision here." *Id.*, at 276, n. 39, 685 F. 2d, at 726, n. 39.[5] Based on two of its precedents concerning the applicability of the bubble concept to certain Clean Air Act programs,[6] the court stated that the bubble concept was "mandatory" in programs designed merely to maintain existing air quality, but held that it was "inappropriate" in programs enacted to improve air quality. *Id.*, at 276, 685 F. 2d, at 726. Since the purpose of the per-

---

[3] National Resources Defense Council, Inc., Citizens for a Better Environment, Inc., and North Western Ohio Lung Association, Inc.

[4] Petitioners, Chevron U. S. A. Inc., American Iron and Steel Institute, American Petroleum Institute, Chemical Manufacturers Association, Inc., General Motors Corp., and Rubber Manufacturers Association were granted leave to intervene and argue in support of the regulation.

[5] The court remarked in this regard:

"We regret, of course, that Congress did not advert specifically to the bubble concept's application to various Clean Air Act programs, and note that a further clarifying statutory directive would facilitate the work of the agency and of the court in their endeavors to serve the legislators' will." 222 U. S. App. D. C., at 276, n. 39, 685 F. 2d, at 726, n. 39.

[6] *Alabama Power Co.* v. *Costle*, 204 U. S. App. D. C. 51, 636 F. 2d 323 (1979); *ASARCO Inc.* v. *EPA*, 188 U. S. App. D. C. 77, 578 F. 2d 319 (1978).

mit program—its *"raison d'être,"* in the court's view—was to improve air quality, the court held that the bubble concept was inapplicable in these cases under its prior precedents. *Ibid.* It therefore set aside the regulations embodying the bubble concept as contrary to law. We granted certiorari to review that judgment, 461 U. S. 956 (1983), and we now reverse.

The basic legal error of the Court of Appeals was to adopt a static judicial definition of the term "stationary source" when it had decided that Congress itself had not commanded that definition. Respondents do not defend the legal reasoning of the Court of Appeals.[7] Nevertheless, since this Court reviews judgments, not opinions,[8] we must determine whether the Court of Appeals' legal error resulted in an erroneous judgment on the validity of the regulations.

## II

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court,

---

[7] Respondents argued below that EPA's plantwide definition of "stationary source" is contrary to the terms, legislative history, and purposes of the amended Clear Air Act. The court below rejected respondents' arguments based on the language and legislative history of the Act. It did agree with respondents contention that the regulations were inconsistent with the purposes of the Act, but did not adopt the construction of the statute advanced by respondents here. Respondents rely on the arguments rejected by the Court of Appeals in support of the judgment, and may rely on any ground that finds support in the record. See *Ryerson* v. *United States,* 312 U. S. 405, 408 (1941); *LeTulle* v. *Scofield,* 308 U. S. 415, 421 (1940); *Langnes* v. *Green,* 282 U. S. 531, 533–539 (1931).

[8] *E. g., Black* v. *Cutter Laboratories,* 351 U. S. 292, 297 (1956); *J. E. Riley Investment Co.* v. *Commissioner,* 311 U. S. 55, 59 (1940); *Williams* v. *Norris,* 12 Wheat. 117, 120 (1827); *McClung* v. *Silliman,* 6 Wheat. 598, 603 (1821).

as well as the agency, must give effect to the unambiguously expressed intent of Congress.[9] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute,[10] as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.[11]

"The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton* v. *Ruiz*, 415 U. S. 199, 231 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation

---

[9] The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. See, *e. g.*, *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S. 27, 32 (1981); *SEC* v. *Sloan*, 436 U. S. 103, 117–118 (1978); *FMC* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 745–746 (1973); *Volkswagenwerk* v. *FMC*, 390 U. S. 261, 272 (1968); *NLRB* v. *Brown*, 380 U. S. 278, 291 (1965); *FTC* v. *Colgate-Palmolive Co.*, 380 U. S. 374, 385 (1965); *Social Security Board* v. *Nierotko*, 327 U. S. 358, 369 (1946); *Burnet* v. *Chicago Portrait Co.*, 285 U. S. 1, 16 (1932); *Webster* v. *Luther*, 163 U. S. 331, 342 (1896). If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

[10] See generally, R. Pound, The Spirit of the Common Law 174–175 (1921).

[11] The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S., at 39; *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 450 (1978); *Train* v. *Natural Resources Defense Council, Inc.*, 421 U. S. 60, 75 (1975); *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965); *Unemployment Compensation Comm'n* v. *Aragon*, 329 U. S. 143, 153 (1946); *McLaren* v. *Fleischer*, 256 U. S. 477, 480–481 (1921).

of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.[12] Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provison for a reasonable interpretation made by the administrator of an agency.[13]

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer,[14] and the principle of deference to administrative interpretations

"has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See, *e. g., National Broadcasting Co.* v. *United States,* 319 U. S. 190; *Labor Board* v. *Hearst Publications, Inc.,* 322 U. S. 111; *Republic Aviation Corp.* v.

---

[12] See, *e. g., United States* v. *Morton, ante,* at 834; *Schweiker* v. *Gray Panthers,* 453 U. S. 34, 44 (1981); *Batterton* v. *Francis,* 432 U. S. 416, 424–426 (1977); *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232, 235–237 (1936).

[13] *E. g., INS* v. *Jong Ha Wang,* 450 U. S. 139, 144 (1981); *Train* v. *Natural Resources Defense Council, Inc.,* 421 U. S., at 87.

[14] *Aluminum Co. of America* v. *Central Lincoln Peoples' Util. Dist., ante,* at 389; *Blum* v. *Bacon,* 457 U. S. 132, 141 (1982); *Union Electric Co.* v. *EPA,* 427 U. S. 246, 256 (1976); *Investment Company Institute* v. *Camp,* 401 U. S. 617, 626–627 (1971); *Unemployment Compensation Comm'n* v. *Aragon,* 329 U. S., at 153–154; *NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111, 131 (1944); *McLaren* v. *Fleischer,* 256 U. S., at 480–481; *Webster* v. *Luther,* 163 U. S., at 342; *Brown* v. *United States,* 113 U. S. 568, 570–571 (1885); *United States* v. *Moore,* 95 U. S. 760, 763 (1878); *Edwards' Lessee* v. *Darby,* 12 Wheat. 206, 210 (1827).

*Labor Board,* 324 U. S. 793; *Securities & Exchange Comm'n* v. *Chenery Corp.,* 332 U. S. 194; *Labor Board* v. *Seven-Up Bottling Co.,* 344 U. S. 344.

". . . If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States* v. *Shimer,* 367 U. S. 374, 382, 383 (1961).

Accord, *Capital Cities Cable, Inc.* v. *Crisp, ante,* at 699–700.

In light of these well-settled principles it is clear that the Court of Appeals misconceived the nature of its role in reviewing the regulations at issue. Once it determined, after its own examination of the legislation, that Congress did not actually have an intent regarding the applicability of the bubble concept to the permit program, the question before it was not whether in its view the concept is "inappropriate" in the general context of a program designed to improve air quality, but whether the Administrator's view that it is appropriate in the context of this particular program is a reasonable one. Based on the examination of the legislation and its history which follows, we agree with the Court of Appeals that Congress did not have a specific intention on the applicability of the bubble concept in these cases, and conclude that the EPA's use of that concept here is a reasonable policy choice for the agency to make.

## III

In the 1950's and the 1960's Congress enacted a series of statutes designed to encourage and to assist the States in curtailing air pollution. See generally *Train* v. *Natural Resources Defense Council, Inc.,* 421 U. S. 60, 63–64 (1975). The Clean Air Amendments of 1970, Pub. L. 91–604, 84 Stat. 1676, "sharply increased federal authority and responsibility

in the continuing effort to combat air pollution," 421 U. S., at 64, but continued to assign "primary responsibility for assuring air quality" to the several States, 84 Stat. 1678. Section 109 of the 1970 Amendments directed the EPA to promulgate National Ambient Air Quality Standards (NAAQS's)[15] and § 110 directed the States to develop plans (SIP's) to implement the standards within specified deadlines. In addition, § 111 provided that major new sources of pollution would be required to conform to technology-based performance standards; the EPA was directed to publish a list of categories of sources of pollution and to establish new source performance standards (NSPS) for each. Section 111(e) prohibited the operation of any new source in violation of a performance standard.

Section 111(a) defined the terms that are to be used in setting and enforcing standards of performance for new stationary sources. It provided:

"For purposes of this section:

.        .        .        .        .

"(3) The term 'stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant." 84 Stat. 1683.

In the 1970 Amendments that definition was not only applicable to the NSPS program required by § 111, but also was made applicable to a requirement of § 110 that each state implementation plan contain a procedure for reviewing the location of any proposed new source and preventing its construction if it would preclude the attainment or maintenance of national air quality standards.[16]

In due course, the EPA promulgated NAAQS's, approved SIP's, and adopted detailed regulations governing NSPS's

---

[15] Primary standards were defined as those whose attainment and maintenance were necessary to protect the public health, and secondary standards were intended to specify a level of air quality that would protect the public welfare.

[16] See §§ 110(a)(2)(D) and 110(a)(4).

for various categories of equipment. In one of its programs, the EPA used a plantwide definition of the term "stationary source." In 1974, it issued NSPS's for the nonferrous smelting industry that provided that the standards would not apply to the modification of major smelting units if their increased emissions were offset by reductions in other portions of the same plant.[17]

*Nonattainment*

The 1970 legislation provided for the attainment of primary NAAQS's by 1975. In many areas of the country, particularly the most industrialized States, the statutory goals were not attained.[18] In 1976, the 94th Congress was confronted with this fundamental problem, as well as many others respecting pollution control. As always in this area, the legislative struggle was basically between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes would retard industrial development with attendant social costs. The 94th Congress, confronting these competing interests, was unable to agree on what response was in the public interest: legislative proposals to deal with nonattainment failed to command the necessary consensus.[19]

In light of this situation, the EPA published an Emissions Offset Interpretative Ruling in December 1976, see 41 Fed. Reg. 55524, to "fill the gap," as respondents put it, until Congress acted. The Ruling stated that it was intended to

---

[17] The Court of Appeals ultimately held that this plantwide approach was prohibited by the 1970 Act, see *ASARCO Inc.*, 188 U. S. App. D. C., at 83–84, 578 F. 2d, at 325–327. This decision was rendered after enactment of the 1977 Amendments, and hence the standard was in effect when Congress enacted the 1977 Amendments.

[18] See Report of the National Commission on Air Quality, To Breathe Clean Air, 3.3–20 through 3.3–33 (1981).

[19] Comprehensive bills did pass both Chambers of Congress; the Conference Report was rejected in the Senate. 122 Cong. Rec. 34375–34403, 34405–34418 (1976).

address "the issue of whether and to what extent national air quality standards established under the Clean Air Act may restrict or prohibit growth of major new or expanded stationary air pollution sources." *Id.*, at 55524–55525. In general, the Ruling provided that "a major new source may locate in an area with air quality worse than a national standard only if stringent conditions can be met." *Id.*, at 55525. The Ruling gave primary emphasis to the rapid attainment of the statute's environmental goals.[20] Consistent with that emphasis, the construction of every new source in nonattainment areas had to meet the "lowest achievable emission rate" under the current state of the art for that type of facility. See *Ibid.* The 1976 Ruling did not, however, explicitly adopt or reject the "bubble concept."[21]

## IV

The Clean Air Act Amendments of 1977 are a lengthy, detailed, technical, complex, and comprehensive response to a major social issue. A small portion of the statute—91 Stat.

---

[20] For example, it stated:

"Particularly with regard to the primary NAAQS's, Congress and the Courts have made clear that economic considerations must be subordinated to NAAQS achievement and maintenance. While the ruling allows for some growth in areas violating a NAAQS if the net effect is to insure further progress toward NAAQS achievement, the Act does not allow economic growth to be accommodated at the expense of the public health." 41 Fed. Reg. 55527 (1976).

[21] In January 1979, the EPA noted that the 1976 Ruling was ambiguous concerning this issue:

"A number of commenters indicated the need for a more explicit definition of 'source.' Some readers found that it was unclear under the 1976 Ruling whether a plant with a number of different processes and emission points would be considered a single source. The changes set forth below define a source as 'any structure, building, facility, equipment, installation, or operation (or combination thereof) which is located on one or more contiguous or adjacent properties and which is owned or operated by the same person (or by persons under common control).' This definition precludes a large plant from being separated into individual production lines for purposes of determining applicability of the offset requirements." 44 Fed. Reg. 3276.

745–751 (Part D of Title I of the amended Act, 42 U. S. C. §§ 7501–7508)—expressly deals with nonattainment areas. The focal point of this controversy is one phrase in that portion of the Amendments.[22]

Basically, the statute required each State in a nonattainment area to prepare and obtain approval of a new SIP by July 1, 1979. In the interim those States were required to comply with the EPA's interpretative Ruling of December 21, 1976. 91 Stat. 745. The deadline for attainment of the primary NAAQS's was extended until December 31, 1982, and in some cases until December 31, 1987, but the SIP's were required to contain a number of provisions designed to achieve the goals as expeditiously as possible.[23]

---

[22] Specifically, the controversy in these cases involves the meaning of the term "major stationary sources" in § 172(b)(6) of the Act, 42 U. S. C. § 7502(b)(6). The meaning of the term "proposed source" in § 173(2) of the Act, 42 U. S. C. § 7503(2), is not at issue.

[23] Thus, among other requirements, § 172(b) provided that the SIP's shall—

"(3) require, in the interim, reasonable further progress (as defined in section 171(1)) including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology;

"(4) include a comprehensive, accurate, current inventory of actual emissions from all sources (as provided by rule of the Administrator) of each such pollutant for each such area which is revised and resubmitted as frequently as may be necessary to assure that the requirements of paragraph (3) are met and to assess the need for additional reductions to assure attainment of each standard by the date required under paragraph (1);

"(5) expressly identify and quantify the emissions, if any, of any such pollutant which will be allowed to result from the construction and operation of major new or modified stationary sources for each such area; . . .

. . . . .

"(8) contain emission limitations, schedules of compliance and such other measures as may be necessary to meet the requirements of this section." 91 Stat. 747.

Section 171(1) provided:

"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial

Most significantly for our purposes, the statute provided that each plan shall

> "(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173 . . . ." *Id.*, at 747.

Before issuing a permit, § 173 requires (1) the state agency to determine that there will be sufficient emissions reductions in the region to offset the emissions from the new source and also to allow for reasonable further progress toward attainment, or that the increased emissions will not exceed an allowance for growth established pursuant to § 172(b)(5); (2) the applicant to certify that his other sources in the State are in compliance with the SIP, (3) the agency to determine that the applicable SIP is otherwise being implemented, and (4) the proposed source to comply with the lowest achievable emission rate (LAER).[24]

---

reductions in the early years following approval or promulgation of plan provisions under this part and section 110(a)(2)(I) and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 172(a)." *Id.*, at 746.

[24] Section 171(3) provides:

"(3) The term 'lowest achievable emission rate' means for any source, that rate of emissions which reflects—

"(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or

"(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent.

"In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance."

The LAER requirement is defined in terms that make it even more stringent than the applicable new source performance standard developed under § 111 of the Act, as amended by the 1970 statute.

The 1977 Amendments contain no specific reference to the "bubble concept." Nor do they contain a specific definition of the term "stationary source," though they did not disturb the definition of "stationary source" contained in § 111(a)(3), applicable by the terms of the Act to the NSPS program. Section 302(j), however, defines the term "major stationary source" as follows:

> "(j) Except as otherwise expressly provided, the terms 'major stationary source' and 'major emitting facility' mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)." 91 Stat. 770.

## V

The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas does not contain any specific comment on the "bubble concept" or the question whether a plantwide definition of a stationary source is permissible under the permit program. It does, however, plainly disclose that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Indeed, the House Committee Report identified the economic interest as one of the "two main purposes" of this section of the bill. It stated:

> "Section 117 of the bill, adopted during full committee markup establishes a new section 127 of the Clean Air Act. The section has two main purposes: (1) to allow reasonable economic growth to continue in an area while making reasonable further progress to assure attainment of the standards by a fixed date; and (2) to allow

States greater flexibility for the former purpose than EPA's present interpretative regulations afford.

"The new provision allows States with nonattainment areas to pursue one of two options. First, the State may proceed under EPA's present 'tradeoff' or 'offset' ruling. The Administrator is authorized, moreover, to modify or amend that ruling in accordance with the intent and purposes of this section.

"The State's second option would be to revise its implementation plan in accordance with this new provision." H. R. Rep. No. 95–294, p. 211 (1977).[25]

The portion of the Senate Committee Report dealing with nonattainment areas states generally that it was intended to "supersede the EPA administrative approach," and that expansion should be permitted if a State could "demonstrate that these facilities can be accommodated within its overall plan to provide for attainment of air quality standards." S. Rep. No. 95–127, p. 55 (1977). The Senate Report notes the value of "case-by-case review of each new or modified major source of pollution that seeks to locate in a region exceeding an ambient standard," explaining that such a review "requires matching reductions from existing sources against

---

[25] During the floor debates Congressman Waxman remarked that the legislation struck

"a proper balance between environmental controls and economic growth in the dirty air areas of America. . . . There is no other single issue which more clearly poses the conflict between pollution control and new jobs. We have determined that neither need be compromised. . . .

"This is a fair and balanced approach, which will not undermine our economic vitality, or impede achievement of our ultimate environmental objectives." 123 Cong. Rec. 27076 (1977).

The second "main purpose" of the provision—allowing the States "greater flexibility" than the EPA's interpretative Ruling—as well as the reference to the EPA's authority to amend its Ruling in accordance with the intent of the section, is entirely consistent with the view that Congress did not intend to freeze the definition of "source" contained in the existing regulation into a rigid statutory requirement.

emissions expected from the new source in order to assure that introduction of the new source will not prevent attainment of the applicable standard by the statutory deadline." *Ibid.* This description of a case-by-case approach to plant additions, which emphasizes the net consequences of the construction or modification of a new source, as well as its impact on the overall achievement of the national standards, was not, however, addressed to the precise issue raised by these cases.

Senator Muskie made the following remarks:

> "I should note that the test for determining whether a new or modified source is subject to the EPA interpretative regulation [the Offset Ruling]—and to the permit requirements of the revised implementation plans under the conference bill—is whether the source will emit a pollutant into an area which is exceeding a national ambient air quality standard for that pollutant—or precursor. Thus, a new source is still subject to such requirements as 'lowest achievable emission rate' even if it is constructed as a replacement for an older facility resulting in a net reduction from previous emission levels.
>
> "A source—including an existing facility ordered to convert to coal—is subject to all the nonattainment requirements as a modified source if it makes any physical change which increases the amount of any air pollutant for which the standards in the area are exceeded." 123 Cong. Rec. 26847 (1977).

## VI

As previously noted, prior to the 1977 Amendments, the EPA had adhered to a plantwide definition of the term "source" under a NSPS program. After adoption of the 1977 Amendments, proposals for a plantwide definition were considered in at least three formal proceedings.

In January 1979, the EPA considered the question whether the same restriction on new construction in nonattainment areas that had been included in its December 1976 Ruling

should be required in the revised SIP's that were scheduled to go into effect in July 1979. After noting that the 1976 Ruling was ambiguous on the question "whether a plant with a number of different processes and emission.points would be considered a single source," 44 Fed. Reg. 3276 (1979), the EPA, in effect, provided a bifurcated answer to that question. In those areas that did not have a revised SIP in effect by July 1979, the EPA rejected the plantwide definition; on the other hand, it expressly concluded that the plantwide approach would be permissible in certain circumstances if authorized by an approved SIP. It stated:

> "Where a state implementation plan is revised and implemented to satisfy the requirements of Part D, including the reasonable further progress requirement, the plan requirements for major modifications may exempt modifications of existing facilities that are accompanied by intrasource offsets so that there is no net increase in emissions. The agency endorses such exemptions, which would provide greater flexibility to sources to effectively manage their air emissions at least cost." *Ibid.*[26]

---

[26] In the same Ruling, the EPA added:

"The above exemption is permitted under the SIP because, to be approved under Part D, plan revisions due by January 1979 must contain adopted measures assuring that reasonable further progress will be made. Furthermore, in most circumstances, the measures adopted by January 1979 must be sufficient to actually provide for attainment of the standards by the dates required under the Act, and in all circumstances measures adopted by 1982 must provide for attainment. See Section 172 of the Act and 43 F R 21673–21677 (May 19, 1978). Also, Congress intended under Section 173 of the Act that States would have some latitude to depart from the strict requirements of this Ruling when the State plan is revised and is being carried out in accordance with Part D. Under a Part D plan, therefore, there is less need to subject a modification of an existing facility to LAER and other stringent requirements if the modification is accompanied by sufficient intrasource offsets so that there is no net increase in emissions." 44 Fed. Reg. 3277 (1979).

In April, and again in September 1979, the EPA published additional comments in which it indicated that revised SIP's could adopt the plantwide definition of source in nonattainment areas in certain circumstances. See *id.*, at 20372, 20379, 51924, 51951, 51958. On the latter occasion, the EPA made a formal rulemaking proposal that would have permitted the use of the "bubble concept" for new installations within a plant as well as for modifications of existing units. It explained:

> "*'Bubble' Exemption:* The use of offsets inside the same source is called the 'bubble.' EPA proposes use of the definition of 'source' (see above) to limit the use of the bubble under nonattainment requirements in the following respects:
>
> "i. Part D SIPs that include all requirements needed to assure reasonable further progress and attainment by the deadline under section 172 and that are being carried out need not restrict the use of a plantwide bubble, the same as under the PSD proposal.
>
> "ii. Part D SIPs that do not meet the requirements specified must limit use of the bubble by including a definition of 'installation' as an identifiable piece of process equipment." [27]

---

[27] *Id.*, at 51926. Later in that Ruling, the EPA added:

"However, EPA believes that complete Part D SIPs, which contain adopted and enforceable requirements sufficient to assure attainment, may apply the approach proposed above for PSD, with plant-wide review but no review of individual pieces of equipment. Use of only a plant-wide definition of source will permit plant-wide offsets for avoiding NSR of new or modified pieces of equipment. However, this is only appropriate once a SIP is adopted that will assure the reductions in existing emissions necessary for attainment. *See* 44 FR 3276 col. 3 (January 16, 1979). If the level of emissions allowed in the SIP is low enough to assure reasonable further progress and attainment, new contruction or modifications with enough offset credit to prevent an emission increase should not jeopardize attainment." *Id.*, at 51933.

Significantly, the EPA expressly noted that the word "source" might be given a plantwide definition for some purposes and a narrower definition for other purposes. It wrote:

> "Source means any building structure, facility, or installation which emits or may emit any regulated pollutant. 'Building, structure, facility or installation' means plant in PSD areas and in nonattainment areas except where the growth prohibitions would apply or where no adequate SIP exists or is being carried out." *Id.*, at 51925.[28]

The EPA's summary of its proposed Ruling discloses a flexible rather than rigid definition of the term "source" to implement various policies and programs:

> "In summary, EPA is proposing two different ways to define source for different kinds of NSR programs:
>
> "(1) For PSD and complete Part D SIPs, review would apply only to plants, with an unrestricted plant-wide bubble.
>
> "(2) For the offset ruling, restrictions on construction, and incomplete Part D SIPs, review would apply to both plants and individual pieces of process equipment, causing the plant-wide bubble not to apply for new and modified major pieces of equipment.
>
> "In addition, for the restrictions on construction, EPA is proposing to define 'major modification' so as to prohibit the bubble entirely. Finally, an alternative discussed but not favored is to have only pieces of process equipment reviewed, resulting in no plant-wide bubble and allowing minor pieces of equipment to escape NSR

---

[28] In its explanation of why the use of the "bubble concept" was especially appropriate in preventing significant deterioration (PSD) in clean air areas, the EPA stated: "In addition, application of the bubble on a plant-wide basis encourages voluntary upgrading of equipment, and growth in productive capacity." *Id.*, at 51932.

regardless of whether they are within a major plant."
*Id.*, at 51934.

In August 1980, however, the EPA adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals in these cases. The EPA took particular note of the two then-recent Court of Appeals decisions, which had created the bright-line rule that the "bubble concept" should be employed in a program designed to maintain air quality but not in one designed to enhance air quality. Relying heavily on those cases,[29] EPA adopted a dual definition of "source" for nonattainment areas that required a permit whenever a change in either the entire plant, or one of its components, would result in a significant increase in emissions even if the increase was completely offset by reductions elsewhere in the plant. The EPA expressed the opinion that this interpretation was "more consistent with congressional intent" than the plantwide definition because it "would bring in more sources or modifications for review," 45 Fed. Reg. 52697 (1980), but its primary legal analysis was predicated on the two Court of Appeals decisions.

In 1981 a new administration took office and initiated a "Government-wide reexamination of regulatory burdens and complexities." 46 Fed. Reg. 16281. In the context of that

---

[29] "The dual definition also is consistent with *Alabama Power* and *ASARCO*. *Alabama Power* held that EPA had broad discretion to define the constituent terms of 'source' so as best to effectuate the purposes of the statute. Different definitions of 'source' can therefore be used for different sections of the statute. . . .

"Moreover, *Alabama Power* and *ASARCO* taken together suggest that there is a distinction between Clean Air Act programs designed to *enhance* air quality and those designed only to *maintain* air quality. . . .

. . . . .

"Promulgation of the dual definition follows the mandate of *Alabama Power*, which held that, while EPA could not define 'source' as a combination of sources, EPA had broad discretion to define 'building,' 'structure,' 'facility,' and 'installation' so as to best accomplish the purposes of the Act." 45 Fed. Reg. 52697 (1980).

review, the EPA reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be given the same definition in both nonattainment areas and PSD areas.

In explaining its conclusion, the EPA first noted that the definitional issue was not squarely addressed in either the statute or its legislative history and therefore that the issue involved an agency "judgment as how to best carry out the Act." *Ibid.* It then set forth several reasons for concluding that the plantwide definition was more appropriate. It pointed out that the dual definition "can act as a disincentive to new investment and modernization by discouraging modifications to existing facilities" and "can actually retard progress in air pollution control by discouraging replacement of older, dirtier processes or pieces of equipment with new, cleaner ones." *Ibid.* Moreover, the new definition "would simplify EPA's rules by using the same definition of 'source' for PSD, nonattainment new source review and the construction moratorium. This reduces confusion and inconsistency." *Ibid.* Finally, the agency explained that additional requirements that remained in place would accomplish the fundamental purposes of achieving attainment with NAAQS's as expeditiously as possible.[30] These conclusions were ex-

---

[30] It stated:

"5. States will remain subject to the requirement that for all nonattainment areas they demonstrate attainment of NAAQS as expeditiously as practicable and show reasonable further progress toward such attainment. Thus, the proposed change in the mandatory scope of nonattainment new source review should not interfere with the fundamental purpose of Part D of the Act.

"6. New Source Performance Standards (NSPS) will continue to apply to many new or modified facilities and will assure use of the most up-to-date pollution control techniques regardless of the applicability of nonattainment area new source review.

"7. In order to avoid nonattainment area new source review, a major plant undergoing modification must show that it will not experience a

pressed in a proposed rulemaking in August 1981 that was formally promulgated in October. See *id.*, at 50766.

## VII

In this Court respondents expressly reject the basic rationale of the Court of Appeals' decision. That court viewed the statutory definition of the term "source" as sufficiently flexible to cover either a plantwide definition, a narrower definition covering each unit within a plant, or a dual definition that could apply to both the entire "bubble" and its components. It interpreted the policies of the statute, however, to mandate the plantwide definition in programs designed to maintain clean air and to forbid it in programs designed to improve air quality. Respondents place a fundamentally different construction on the statute. They contend that the text of thè Act requires the EPA to use a dual definition—if either a component of a plant, or the plant as a whole, emits over 100 tons of pollutant, it is a major stationary source. They thus contend that the EPA rules adopted in 1980, insofar as they apply to the maintenance of the quality of clean air, as well as the 1981 rules which apply to nonattainment areas, violate the statute.[31]

### Statutory Language

The definition of the term "stationary source" in § 111(a)(3) refers to "any building, structure, facility, or installation" which emits air pollution. See *supra*, at 846. This definition is applicable only to the NSPS program by the express terms of the statute; the text of the statute does not make this defi-

---

significant net increase in emissions. Where overall emissions increase significantly, review will continue to be required." 46 Fed. Reg. 16281 (1981).

[31] "What EPA may not do, however, is define all four terms to mean *only* plants. In the 1980 PSD rules, EPA did just that. EPA compounded the mistake in the 1981 rules here under review, in which it abandoned the dual definition." Brief for Respondents 29, n. 56.

nition applicable to the permit program. Petitioners therefore maintain that there is no statutory language even relevant to ascertaining the meaning of stationary source in the permit program aside from § 302(j), which defines the term "major stationary source." See *supra*, at 851. We disagree with petitioners on this point.

The definition in § 302(j) tells us what the word "major" means—a source must emit at least 100 tons of pollution to qualify—but it sheds virtually no light on the meaning of the term "stationary source." It does equate a source with a facility—a "major emitting facility" and a "major stationary source" are synonymous under § 302(j). The ordinary meaning of the term "facility" is some collection of integrated elements which has been designed and constructed to achieve some purpose. Moreover, it is certainly no affront to common English usage to take a reference to a major facility or a major source to connote an entire plant as opposed to its constituent parts. Basically, however, the language of § 302(j) simply does not compel any given interpretation of the term "source."

Respondents recognize that, and hence point to § 111(a)(3). Although the definition in that section is not literally applicable to the permit program, it sheds as much light on the meaning of the word "source" as anything in the statute.[32] As respondents point out, use of the words "building, structure, facility, or installation," as the definition of source, could be read to impose the permit conditions on an individual building that is a part of a plant.[33] A "word may have a character of its own not to be submerged by its association." *Russell Motor Car Co.* v. *United States*, 261 U. S. 514, 519

---

[32] We note that the EPA in fact adopted the language of that definition in its regulations under the permit program. 40 CFR §§ 51.18(j)(1)(i), (ii) (1983).

[33] Since the regulations give the States the option to define an individual unit as a source, see 40 CFR § 51.18(j)(1) (1983), petitioners do not dispute that the terms can be read as respondents suggest.

(1923). On the other hand, the meaning of a word must be ascertained in the context of achieving particular objectives, and the words associated with it may indicate that the true meaning of the series is to convey a common idea. The language may reasonably be interpreted to impose the requirement on any discrete, but integrated, operation which pollutes. This gives meaning to all of the terms—a single building, not part of a larger operation, would be covered if it emits more than 100 tons of pollution, as would any facility, structure, or installation. Indeed, the language itself implies a "bubble concept" of sorts: each enumerated item would seem to be treated as if it were encased in a bubble. While respondents insist that each of these terms must be given a discrete meaning, they also argue that § 111(a)(3) defines "source" as that term is used in § 302(j). The latter section, however, equates a source with a facility, whereas the former defines "source" as a facility, among other items.

We are not persuaded that parsing of general terms in the text of the statute will reveal an actual intent of Congress.[34]

---

[34] The argument based on the text of § 173, which defines the permit requirements for nonattainment areas, is a classic example of circular reasoning. One of the permit requirements is that "the proposed source is required to comply with the lowest achievable emission rate" (LAER). Although a State may submit a revised SIP that provides for the waiver of another requirement—the "offset condition"—the SIP may not provide for a waiver of the LAER condition for any proposed source. Respondents argue that the plantwide definition of the term "source" makes it unnecessary for newly constructed units within the plant to satisfy the LAER requirement if their emissions are offset by the reductions achieved by the retirement of older equipment. Thus, according to respondents, the plantwide definition allows what the statute explicitly prohibits—the waiver of the LAER requirement for the newly constructed units. But this argument proves nothing because the statute does not prohibit the waiver unless the proposed new unit is indeed subject to the permit program. If it is not, the statute does not impose the LAER requirement at all and there is no need to reach any waiver question. In other words, § 173 of the statute merely deals with the consequences of the definition of the term "source" and does not define the term.

We know full well that this language is not dispositive; the terms are overlapping and the language is not precisely directed to the question of the applicability of a given term in the context of a larger operation. To the extent any congressional "intent" can be discerned from this language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the agency's power to regulate particular sources in order to effectuate the policies of the Act.

## Legislative History

In addition, respondents argue that the legislative history and policies of the Act foreclose the plantwide definition, and that the EPA's interpretation is not entitled to deference because it represents a sharp break with prior interpretations of the Act.

Based on our examination of the legislative history, we agree with the Court of Appeals that it is unilluminating. The general remarks pointed to by respondents "were obviously not made with this narrow issue in mind and they cannot be said to demonstrate a Congressional desire . . . ." *Jewell Ridge Coal Corp.* v. *Mine Workers,* 325 U. S. 161, 168–169 (1945). Respondents' argument based on the legislative history relies heavily on Senator Muskie's observation that a new source is subject to the LAER requirement.[35] But the full statement is ambiguous and like the text of § 173 itself, this comment does not tell us what a new source is, much less that it is to have an inflexible definition. We find that the legislative history as a whole is silent on the precise issue before us. It is, however, consistent with the view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments.

---

[35] See *supra,* at 853. We note that Senator Muskie was not critical of the EPA's use of the "bubble concept" in one NSPS program prior to the 1977 amendments. See *ibid.*

More importantly, that history plainly identifies the policy concerns that motivated the enactment; the plantwide definition is fully consistent with one of those concerns—the allowance of reasonable economic growth—and, whether or not we believe it most effectively implements the other, we must recognize that the EPA has advanced a reasonable explanation for its conclusion that the regulations serve the environmental objectives as well. See *supra*, at 857–859, and n. 29; see also *supra*, at 855, n. 27. Indeed, its reasoning is supported by the public record developed in the rulemaking process,[36] as well as by certain private studies.[37]

Our review of the EPA's varying interpretations of the word "source"—both before and after the 1977 Amendments—convinces us that the agency primarily responsible for administering this important legislation has consistently interpreted it flexibly—not in a sterile textual vacuum, but in the context of implementing policy decisions in a technical and complex arena. The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations

---

[36] See, for example, the statement of the New York State Department of Environmental Conservation, pointing out that denying a source owner flexibility in selecting options made it "simpler and cheaper to operate old, more polluting sources than to trade up. . . ." App. 128–129.

[37] "Economists have proposed that economic incentives be substituted for the cumbersome administrative-legal framework. The objective is to make the profit and cost incentives that work so well in the marketplace work for pollution control. . . . [The 'bubble' or 'netting' concept] is a first attempt in this direction. By giving a plant manager flexibility to find the places and processes within a plant that control emissions most cheaply, pollution control can be achieved more quickly and cheaply." L. Lave & G. Omenn, Cleaning the Air: Reforming the Clean Air Act 28 (1981) (footnote omitted).

and the wisdom of its policy on a continuing basis. Moreover, the fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute.

Significantly, it was not the agency in 1980, but rather the Court of Appeals that read the statute inflexibly to command a plantwide definition for programs designed to maintain clean air and to forbid such a definition for programs designed to improve air quality. The distinction the court drew may well be a sensible one, but our labored review of the problem has surely disclosed that it is not a distinction that Congress ever articulated itself, or one that the EPA found in the statute before the courts began to review the legislative work product. We conclude that it was the Court of Appeals, rather than Congress or any of the decisionmakers who are authorized by Congress to administer this legislation, that was primarily responsible for the 1980 position taken by the agency.

*Policy*

The arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging in a judicial forum a specific policy battle which they ultimately lost in the agency and in the 32 jurisdictions opting for the "bubble concept," but one which was never waged in the Congress. Such policy arguments are more properly addressed to legislators or administrators, not to judges.[38]

---

[38] Respondents point out if a brand new factory that will emit over 100 tons of pollutants is constructed in a nonattainment area, that plant must obtain a permit pursuant to § 172(b)(6) and in order to do so, it must satisfy the § 173 conditions, including the LAER requirement. Respondents argue if an old plant containing several large emitting units is to be modernized by the replacement of one or more units emitting over 100 tons of pollutant with a new unit emitting less—but still more than 100 tons—the result should be no different simply because "it happens to be built not at a new site, but within a *pre-existing plant.*" Brief for Respondents 4.

In these cases the Administrator's interpretation represents a reasonable accommodation of manifestly competing interests and is entitled to deference: the regulatory scheme is technical and complex,[39] the agency considered the matter in a detailed and reasoned fashion,[40] and the decision involves reconciling conflicting policies.[41]   Congress intended to accommodate both interests, but did not do so itself on the level of specificity presented by these cases.   Perhaps that body consciously desired the Administrator to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question, and those on each side decided to take their chances with the scheme devised by the agency.   For judicial purposes, it matters not which of these things occurred.

Judges are not experts in the field, and are not part of either political branch of the Government.   Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences.   In contrast, an agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments.   While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the

---

[39] See, e. g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., ante, at 390.

[40] See SEC v. Sloan, 436 U. S., at 117; Adamo Wrecking Co. v. United States, 434 U. S. 275, 287, n. 5 (1978); Skidmore v. Swift & Co., 323 U. S. 134, 140 (1944).

[41] See Capital Cities Cable, Inc. v. Crisp, ante, at 699–700; United States v. Shimer, 367 U. S. 374, 382 (1961).

agency charged with the administration of the statute in light of everyday realities.

When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *TVA* v. *Hill*, 437 U. S. 153, 195 (1978).

We hold that the EPA's definition of the term "source" is a permissible construction of the statute which seeks to accommodate progress in reducing air pollution with economic growth. "The Regulations which the Adminstrator has adopted provide what the agency could allowably view as . . . [an] effective reconciliation of these twofold ends . . . ." *United States* v. *Shimer*, 367 U. S., at 383.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE MARSHALL and JUSTICE REHNQUIST took no part in the consideration or decision of these cases.

JUSTICE O'CONNOR took no part in the decision of these cases.