**UNITED STATES of America, Plaintiff,**

v.

**NAPCO INTERNATIONAL,
INC., Defendant.**

Civ. No. 4–92–1087.

United States District Court,
D. Minnesota,
Fourth-Division.

Sept. 30, 1993.

**494**

Francis X. Hermann, U.S. Atty., and Lynn A. Zentner, Asst. U.S. Atty., Minneapolis, MN, Carolyn G. Mark, U.S. Dept. of Justice, Civil Div., Washington, DC, Michael F. Hertz, Stephen D. Altman, for plaintiff.

Allen I. Saeks, Peter E. Schifsky, Leonard, Street & Deinard, Minneapolis, MN, for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant's motion for summary judgment.[1] The motion will be granted.

### FACTS

#### I. *Foreign Military Sale Program*

The Foreign Military Sale (FMS) program was established by the Arms Export Control Act, 22 U.S.C. § 2751, *et seq.*, to permit the United States to help friendly foreign countries and international organizations to purchase United States defense articles and services. Most transactions financed by the United States are government-to-government sales, *i.e.*, the foreign government contracts with the United States to purchase United States goods and services. However, certain governments, including the Government of Turkey, are permitted to purchase goods and services directly from United States companies. Financing for these direct commercial contracts is approved by the Defense Security Assistance Agency (DSAA). Upon approval, DSAA sets aside FMS credits in the government's treasury to be used by the foreign governments to purchase the defense articles or services directly from United States contractors. Am.Compl. at ¶ 11, 12.

The President has delegated his authority under the Act to the Secretary of Defense. See section 1(n) of Ex.Ord. No 11958, Jan. 18, 1977, 42 F.R. 4311. The Secretary of Defense has delegated his authority to the DSAA. DOD Directive 5105.38 (Aug. 10, 1978).

#### II. *Defendant Napco's Actions*

Defendant Napco International, Inc. (Napco) has been in the business of selling ordnance and spare military parts to government and non-government purchasers, both foreign and domestic for forty years. Napco's sales of ordnance to foreign governments include replacement parts and retrofits for older military vehicles and equipment, such as armored personnel carriers and tanks. In order to locate spare parts for this older equipment, some of which is nearing obsolescence by United States military standards, Napco "scrounges" for the parts from both foreign and domestic sources. Purchasing from inventories of previously manufactured parts, rather than ordering the parts newly manufactured to specification, allows Napco to charge substantially lower prices. In addition, Napco's delivery times are substantially shortened. Turkey is a participant in the FMS program, and has purchased material from Napco with FMS credits. Napco's practice of scrounging from foreign sources is the focus of this action.

In 1986, Napco entered into the first of the four purchase agreements with Turkey which are the subject of this motion.[2] (The purchase agreements are designated 85/9–5, 58 Ord 86/S, 93 Ord 86/9, and FMS Ord 89 3/3.) In each purchase agreement, Napco agreed to supply Turkey with mechanical parts such as bearings, gears, and turbines. In connection with each purchase agreement, Napco signed a contractor's certification. After locating the parts requested by Turkey, Napco

---

1. Defendant moved for partial dismissal under Rule 12(b)(6) and 9(b). The Court concludes however that defendant's motion is more appropriately treated as a motion for summary judgment under Rule 56 because the motion relies upon matters outside the pleadings.

2. The government's first amended complaint alleges that Napco submitted false claims in seven purchase agreements. Napco is seeking dismissal of only the four designated purchase agreements.

shipped them to Turkey, generating separate invoices for each of twelve shipments. Turkey then forwarded Napco's invoices to DSAA, which authorized payment. Napco has received payment for all twelve invoices issued in connection with the four purchase agreements. The first invoice issued under the purchase agreements is dated September 26, 1986, and the last invoice is dated September 28, 1990.

Some of the material supplied to Turkey under the purchase agreements was originally of United States manufacture, but was obtained by Napco from Saymar, an Israeli firm, which obtained the material from surplus United States military stockpiles in Israel. One invoice references material obtained by Napco from a Canadian firm similar to Saymar. Again, the material was originally of United States manufacture.

At the root of this lawsuit is the parties' differing interpretations of the Arms Export Control Act, in particular, 22 U.S.C. §§ 2791(a) and (c). The DSAA's separately issued guidelines pose additional interpretive challenges. In essence, the government maintains that Napco's "foreign procurement" of materials was contrary to the clear mandate and intent of the statute. Napco, on the other hand, admits that it purchased military supplies from stockpiles in Israel and Canada, but argues that such purchases do not constitute foreign procurement because the materials were originally manufactured in the United States. The government sued Napco, stating four causes of action: (1) False Claims Act, 31 U.S.C. § 3729(a)(1), knowingly presenting or causing to be presented, false or fraudulent claims to the United States; (2) False Claims Act, 31 U.S.C. § 3729(a)(2), knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States; (3) payment by mistake; (4) unjust enrichment. The government requests treble damages under the False Claims Act.

## DISCUSSION

### I. *Rule 9(b)*

■ Napco claims that the government's causes of action under the False Claims Act fall far short of the pleading requirements of Fed.R.Civ.P. 9(b) as it relates to fraud. Rule 9(b) states that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." As a preliminary matter, the government maintains that Rule 9(b) is not applicable to statutory claims, as opposed to claims of common law fraud. The Court disagrees. Several district courts have applied Rule 9(b) to the False Claims Act. *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142 (N.D.Ill. Jan. 8, 1993); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Blue Cross Blue Shield of Georgia*, 755 F.Supp. 1055 (S.D.Ga.1990); *United States ex rel. McCoy v. Cal. Med. Review, Inc.*, 723 F.Supp. 1363 (N.D.Cal. 1989). Moreover, this position is consistent with the purposes of the Rule, which are:

> (1) to inhibit the filing of a complaint as a pretext for discovery of unknown wrongs; (2) to protect defendants from the harm that results from charges of serious wrongdoing; and (3) to give defendants notice of the conduct complained of, enabling defendants to prepare a defense.

*Coronet Ins. Co. v. Seyfarth*, 665 F.Supp. 661, 666 (N.D.Ill.1987).

■ In determining the sufficiency of the pleading, the Court has considered "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982), *aff'd*, 710 F.2d 1361 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). *See also Hagert v. Glickman, Lurie, Eiger & Co.*, 520 F.Supp. 1028, 1036 (D.Minn.1981) (plaintiffs are required to set forth the time, place and circumstances of the alleged fraudulent activities). The Court concludes that each element which is required to be alleged with particularity under Rule 9(b) has in fact been alleged. In its first amended complaint, the government details for each purchase agreement at issue the date of the contractor certification signed by Napco, the date of each invoice (or alleged false claim), the invoice number, and the invoice amount. In addition, the amended complaint describes

the alleged misrepresentation by identifying the country from which the materials were obtained, and the dollar amount spent on each procurement. It is the Court's opinion that the government's amended complaint does not suffer from lack of particularity.

## II. *Summary Judgment Standard*

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## III. *Statutory Interpretation*

■ 22 U.S.C. § 2791(a) states:

In carrying out this chapter, special emphasis shall be placed on procurement in the United States, but, subject to the provisions of subsection (b) of this section, consideration shall also be given to coproduction or licensed production outside the United States of defense articles of United States origin when such production best serves the foreign policy, national security, and economy of the United States. In evaluating any sale proposed to be made pursuant to this chapter, there shall be taken into consideration (1) the extent to which the proposed sale damages or infringes upon licensing arrangements whereby United States entities have granted licenses for the manufacture of the defense articles selected by the purchasing country to entities located in friendly foreign countries, which licenses result in financial returns to the United States, (2) the portion of the defense articles so manufactured which is of United States origin, and (3) in coordination with the Director of the United States Arms Control and Disarmament Agency, the Director's opinion as to the extent to which such sale might contribute to an arms race, or increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control arrangements.

22 U.S.C. § 2791(c) states:

Funds made available under this chapter may be *used for procurement outside the United States only if the President determines that such procurement will not result in adverse effects* upon the economy of the United States or the industrial mobilization base, with special reference to any areas of labor surplus or to the net position of the United States in its balance of payments with the rest of the world, which outweigh the economic or other advantages to the United States of less costly procurement outside the United States.

(Emphasis added).

The DSAA's Guidelines for FMS Financing of Direct Commercial Contracts, original-

ly issued October 9, 1985,[3] state in pertinent part:

> 1. Purchases must be from U.S. incorporated firms licensed to do business in the U.S.
>
> 2. The items purchased *must be manufactured in the U.S. and be composed mainly of U.S. made items, components and services.* In the event that the purchase of a U.S. end item consists of both U.S. and non-U.S. components and services, only the value of the U.S. components and services will normally be financed. Foreign content which is an integral part of end products manufactured in the U.S. may be eligible for FMS loan financing under certain limited circumstances.

Affidavit of Peter E. Schifsky Exh. B (emphasis added). The Guidelines also contained a list of "Essential Contract Elements", which states in pertinent part:

> 2. *Elements that May be Included in the Contract, or Submitted by the Contractor in a Separate Document to DSAA Prior to Approval of the Contract for FMS Credit Funding*
>
> a. Identification of the non-U.S. origin components and services.

Schifsky Aff.Exh.B (emphasis in original).

■ The contractor's certification signed by Napco is virtually identical to the sample certification form found in the DSAA issued Security Assistance Management Manual. In the certification, Napco stated that, "the material or components to be provided under the Purchase Agreement are *predominantly of U.S. manufacture*," and that, "all *non-U.S. origin or non-U.S. manufactured items* ... [are] indicated below." Schifsky Aff. Exh. C. Likewise, on each invoice sent by Napco, Napco stated that, "we certify that the material supplied on this invoice *is wholly of U.S.A. origin.*" Def.'s Mem. at 5 (emphasis added).

Napco argues that the government has no basis for its claim that Napco submitted false material information to DSAA regarding the United States origin and United States manufacture of the parts supplied to Turkey under the purchase agreements. Napco's position is that material may be "procured from Israel" and still be of "U.S. origin or manufacture".

The government argues first that the statute is straightforward, absolutely limiting procurement outside of the United States. Further, the government maintains that, even assuming an ambiguity in the statute, the DSAA's interpretation of the statute is reasonable and must be followed by this Court. The government notes that the purpose of the statutory prohibition against foreign procurement is to ensure that money is spent within the United States, benefitting the United States economy and United States businesses, as well as assisting foreign governments, without funding foreign competition. *See* S.Rep. No. 1799, 83rd Cong., 2d Sess. (1954); International Development and Security: Hearings on S.1983 Before the Senate Committee On Foreign Relations, 87th Cong. 1st Sess. 51–52 (1961).[4]

When interpreting a statute, the courts look first to whether Congress has addressed the issue directly. If not, the agency's interpretation of the statute is entitled to great deference. *Chevron v. National Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Emerson v. Steffen,* 959 F.2d 119 (8th Cir.1992). Here, 22 U.S.C. § 2791(a) and (c) are clearly ambiguous. While the statute states that "special emphasis shall be placed on procurement in the United States ...," 22 U.S.C. § 2791(a), the statute does *not* directly prohibit procurements of the kind made by Napco in this case. The items for consideration in evaluating any procurement, set forth in both sections of the statute, above, are no more helpful to Napco in evaluating the law and determining a proper course of action.

Turning to the DSAA's regulations, it is equally clear that the DSAA has not directly

---

3. The DSAA Guidelines were reissued in 1987 and 1989, and amended slightly in 1989.

4. Napco contends that its actions do not abrogate policy concerns because it employs a number of people to track the location, quality, condition and price of more than a million parts. Napco argues that it would be neither prudent nor feasible to manufacture new parts simply to create new jobs.

addressed the issue of foreign procurement of materials originally manufactured in the United States. It is clear that the Court may not substitute its own construction of a statutory provision for a reasonable interpretation by the agency, *Chevron,* 467 U.S. at 843–44 n. 11, 104 S.Ct. at 2782 n. 11; *Independent Community Bankers Ass'n. of South Dakota v. Board of Governors of the Federal Reserve System,* 838 F.2d 969 (8th Cir.1988) (even where purely legal issues are involved, courts should grant great deference to the agency's reasonable interpretation of its statute). However, the Court may exercise its judgment in a question such as this, where the agency's regulations are not clearly stated. The DSAA's regulations shed no light upon the narrow issue of foreign procurement which is involved here, and an interpretive afterthought by the agency as to the meaning of the statute is not binding on the Court.

At the heart of the dispute is Napco's contention that its contractor certifications were truthful. The Court agrees that the certifications were truthful. Each certification at issue in this case was accurate and did not violate the DSAA's regulations, as alleged by the government.

Accordingly, based upon the foregoing, and upon all the files, records and proceedings herein,

**IT IS ORDERED** that:

Defendant's motion for summary judgment as to counts 1–4 of plaintiff's first amended complaint is hereby granted to the extent that those counts pertain to the following purchase agreements:

(1) 85/9–5 (referred to in the first amended complaint at ¶ 35–47);

(2) 58 ORD 86/S (referred to in the first amended complaint at ¶ 48–52);

(3) 93 Ord 86/9 (referred to in the first amended complaint at ¶ 68–70); and

(4) FMS Ord 89 3/3 (referred to in the first amended complaint at ¶ 78–84).