**WOODSTOCK/KENOSHA HEALTH CENTER, Plaintiff-Appellee,**

**v.**

**Otis R. BOWEN, M.D., Secretary of the United States Department of Health and Human Services, Defendant-Appellant,**

**and**

**Linda Reivitz, Secretary of the Wisconsin Department of Health and Social Services, Defendant-Appellee.**

No. 85–3106.

United States Court of Appeals, Seventh Circuit.

Argued June 12, 1986.

Decided Jan. 13, 1987.

Rehearing and Rehearing En Banc Denied March 18, 1987.

Thomas W. Crawley, Dept. Health & Human Service, Chicago, Ill., for defendant-appellant.

F. Thomas Creeron, III, Dept. of Justice of State of Wis., Madison, Wis., Carol Colborn, Pierson, Ball & Dowd, Washington, D.C., for plaintiff-appellee.

Before BAUER, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The Secretary of the United States Department of Health and Human Services appeals from the judgment of the district court which held that he is without authority to recover the federal share of Medicaid funds which he alleges were improperly paid to the appellee, Woodstock/Kenosha Health Center. After reviewing the statutory and regulatory schemes that were applicable to Medicaid at the time of this case, we conclude that the district court erred. Accordingly, we reverse the judgment of the district court and remand this case for further proceedings.[1]

I

The facts of this case have been extensively set forth in the earlier decisions of this court, see *Woodstock/Kenosha Health Center v. Schweiker*, 713 F.2d 285 (7th Cir.1983), and of the district court, see *Woodstock/Kenosha Health Center v. Heckler*, No. 81–C–550 (E.D.Wis. Sept. 30, 1985) [hereinafter Order]; *Woodstock/Kenosha Health Center v. Schweiker*, 542 F.Supp. 1210 (E.D.Wis.1982). Therefore, we shall set forth here only those facts which are necessary to place our present decision in context.

Prior to November 1, 1975, Woodstock/Kenosha Health Center (Woodstock) was a health care provider that, as a skilled nursing facility (SNF), was receiving funds pursuant to both the Medicare and Medicaid programs. While the details of the programs are not essential to this case, it is important to note that Medicare is a federally-sponsored program in which the federal government enters into a *direct* relationship with the private health care provider. Medicaid is also a federally-sponsored program. However, it is distinguished from Medicare by the active participation of the states as middlemen in the payment procedure. Under Medicaid, the state, not the federal government, enters into a direct agreement with a local health care provider. The federal government's involvement is limited to reimbursing the state for a portion of its expenses.

In this case, Woodstock was informed by the United States Department of Health and Human Services (HHS)[2] that its Medicare provider agreement would not be renewed by the federal government when it came due on October 31, 1975. This decision was based on information which was provided to HHS by the State of Wisconsin, acting as a survey agency for HHS. As a result, Woodstock's Medicare eligibility was terminated as of November 1, 1975. This nonrenewal decision was ultimately affirmed at the conclusion of Woodstock's administrative appeals.

However, this case does not focus on the Medicare nonrenewal in its own right. Rather, the parties are only concerned about the Medicare nonrenewal because HHS argues that the Wisconsin Department of Health and Social Services (WHSS) was compelled to cease its Medicaid payments to Woodstock at the same time as the Medicare payments stopped. In essence, HHS argues that WHSS was required not to renew Woodstock's Medicaid provider agreement because HHS had decided not to renew Woodstock's Medicare provider agreement at the end of October 1975.

Anticipating that HHS would initiate an action to recover its share of the Medicaid funds paid to Woodstock between November 1, 1975 and November 30, 1976, Woodstock filed this action seeking declaratory and injunctive relief. Woodstock's argument is two-fold. First, Woodstock contends that HHS was without authority, at the time of this case, to compel Wisconsin not to renew Woodstock's Medicaid provider agreement. Second, assuming HHS had

1. We decline to reexamine the jurisdictional issues that were decided in our earlier judgment, *Woodstock/Kenosha Health Center v. Schweiker*, 713 F.2d 285 (7th Cir.1983).

2. The Department of Health and Human Services is a successor to the United States Department of Health, Education and Welfare.

that authority, Woodstock contends that the Medicare nonrenewal decision was improper. The district court did not reach this second issue. Rather, it held that HHS was without authority to require that a state Medicaid agency refuse to renew a Medicaid provider agreement simply because the federal government had refused to renew a Medicare provider agreement. For the reasons set forth in the following sections, we respectfully disagree with the district court's conclusion. Accordingly, we reverse that judgment and remand this case for further proceedings.

## II

### A

In the district court, HHS first argued that 45 C.F.R. § 249.33(a)(9) (1975) gave the Secretary the authority to require that a state Medicaid agency not renew a provider agreement if the Secretary refused to renew a Medicare provider agreement. That regulation requires that a state's Medicaid plan—the formal document describing the Medicaid relationship between a state and the federal government—must provide:

> that in the case of skilled nursing facilities certified under the provisions of [Medicare], the term of a provider agreement shall be subject to the same terms and conditions and coterminous with the period of approval of eligibility specified by the Secretary pursuant to [Medicare], and upon notification that an agreement with a facility under [Medicare] has been terminated or cancelled, the single State agency will take appropriate action to terminate the facility's participation under [Medicaid]. A facility whose agreement has been cancelled or otherwise terminated may not be issued another agreement until the reasons which cause the cancellation or termination have been removed and reasonable assurance pro-

vided the survey agency that they will not recur.

45 C.F.R. § 249.33(a)(9) (1975).

The district court held that section 249.-33(a)(9), by specifically referring to Medicare agreements which have been "terminated or cancelled," could not be read so broadly as to include situations in which the Secretary merely refused to renew—as opposed to "terminated" or "cancelled"—a Medicare provider agreement. In support of this reading, the district judge first noted that the version of section 249.33 in effect at the time of trial, 42 C.F.R. § 442.20(b) (1984), specifically gave the Secretary authority to require appropriate state action in the event of nonrenewals—not just in the event of terminations or cancellations. By referring to the 1979 preamble that accompanied the adoption of this new version of the regulation, the district court concluded that the Secretary considered this amendment to be an expansion of his authority.[3] The district court therefore reasoned that, if the Secretary first recognized nonrenewal authority in 1979, he could not have relied upon it in 1975 when the Woodstock Medicare provider agreement came due and was not renewed.

### B

We begin our analysis by noting that the task before the district judge in this case was not an easy one. The relevant departmental regulations are not models of clarity. Moreover, as we shall discuss at greater length in the following paragraphs, the district judge's approach is not without some force. However, because the issue before us is one of law, it is our duty to undertake our own analysis of the statutory and regulatory scheme. In performing this task, our primary obligation remains, at all times, to interpret the statutory framework and the regulatory scheme in a manner which ensures a result compatible with the intent of Congress.

In our view, the statutory scheme clearly contemplates that, in situations

---

**3.** The preamble states: "The proposed rules expanded § 442.20 to make it applicable also to cases of denials and nonrenewals." 44 Fed.Reg. 9750 (1979).

such as this one,[4] in which Medicaid certifications are dependent on Medicare certifications, the certifications are to be coterminous. Section 1396i(a)(1) of Title 42 provides that "[w]henever the Secretary certifies an institution in a State to be qualified as a skilled nursing facility under [Medicare], such institution shall be deemed to meet the standards for certification as a skilled nursing facility for purposes of [Medicaid]." We also note that the requirements for certification are virtually identical under both Medicare and Medicaid, *see* 42 U.S.C. § 1396a(a)(28).

Neither the legislative history of section 1396i(a)(1) nor the 1975 regulations focuses in any elaborate fashion on the precise situation before us today—when a Medicaid program is terminated because the Medicare certification upon which it depends is not renewed. The chief concern of the Congress and, to a lesser degree the Secretary in the 1975 regulations, was the situation in which a Medicaid program is terminated because the Medicare program to which it is tied is terminated before its normal expiration date because of the misfeasance of the facility.[5] However, the emphasis placed on this particular scenario by the Congress and the Secretary hardly permits us to draw the inference that the statute's basic structure—making Medicare and Medicaid certification coterminous where Medicaid certification is dependent on Medicare certification—was to be abrogated in the case of a Medicare nonrenew-

al. Indeed, it is quite clear that the Secretary has consistently acknowledged that this basic dependency of Medicaid certification was to be universally applied. Indeed, in another clause of section 249.33(a)(9) (1975), the Secretary explicitly acknowledged that mandate:

[I]n the case of [SNF"s] certified under the provisions of [Medicare], the term of a provider agreement shall be subject to the same terms and conditions and *coterminous* with the period of approval of eligibility specified by the Secretary pursuant to [Medicare]....

(emphasis added). Moreover, in other areas, the 1975 regulations do not give the term "termination" the restrictive meaning suggested by Woodstock.[6] In short, we find no basis for Woodstock's submission that the Secretary must have used "nonrenewal" and "termination" in a mutually exclusive fashion. Indeed, it appears that the Secretary has consistently acknowledged that, when Medicare eligibility ends, Medicaid eligibility also ends. That consistent interpretation of the department's mandate should be accorded substantial deference. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Bauzo v. Bowen,* 803 F.2d 917, 921 (7th Cir.1986).

### C

The district court found persuasive that, in the preamble to the 1979 HHS regula-

---

**4.** Woodstock apparently was certified for purposes of Medicaid under 45 C.F.R. § 249.-33(a)(1)(ii) (1975), a provision that allowed a state to certify an institution for the purposes of Medicaid if the Secretary had determined that the institution qualified as a skilled nursing facility under Medicare. Woodstock has not argued that, during the period in question, it was independently certified as a Medicaid provider by the State of Wisconsin pursuant to 45 C.F.R. § 249.33(a)(1)(i) (1975).

**5.** For instance, the House Report to the Social Security Amendments of 1972 states that, with respect to suppliers of services who either furnish inferior or harmful supplies or services, engage in fraudulent activities, or consistently overcharge for their services, "there would be no Federal financial participation in any ex-

penditure under the medicaid and maternal and child health programs by the State with respect to services furnished by a supplier to whom the Secretary would not make medicare payments under this provision of the bill." H.R.Rep. No. 231, 92d Cong., 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Admin.News 4989, 5085. For the same reason, it is not surprising that the 1975 regulation did not use the precise term "nonrenewal," but instead employed the broader language of "termination" and "cancellation."

**6.** For instance, 20 C.F.R. § 405.604(c)(2) (1975) distinguished nonrenewal situations from terminations for cause which were described in 20 C.F.R. § 405.614 (1975). Yet both nonrenewals and terminations for cause were described as "terminations" in 20 C.F.R. § 405.615 (1975).

tions—the first version of this regulation to mention nonrenewals specifically—the agency stated that "[t]he proposed rules *expanded* § 442.20 [formerly section 249.-33] to make it applicable also in the cases of denials and nonrenewals." 44 Fed.Reg. 9750 (1979) (emphasis added). "This statement shows," wrote the district court, "that HHS intended to make a substantive change in the regulation, thus expanding the state agency's obligations to include instances of nonrenewal. Prior to 1979, then, HHS could only require parallel action by the state agency respecting a Medicaid agreement where a Medicare agreement was terminated or cancelled." Order at 4; R.57 at 4.

The department's choice of language in the 1979 preamble is indeed puzzling and we can well understand why the district court—faced with the other ambiguities of this statutory and regulatory scheme—decided to rest its decision on this comparatively straightforward language. However, in our view, such reliance is not warranted for several reasons. First, as we have already noted, the Secretary had previously acknowledged, in the 1975 regulations, that the basic structure of the statute required that Medicare certifications and derivative Medicaid certifications be coterminous. Second, there is persuasive evidence that the 1979 regulations were not, at least with respect to "nonrenewals," meant to expand, but rather to clarify, the Secretary's authority. The actual 1979 revision of that section (by then renumbered as section 442.20) reads: "(b) If the Secretary notifies the Medicaid agency that he has denied, terminated, or refused to renew a Medicare agreement with a SNF, the agency must deny, terminate, or refuse to renew its Medicaid agreement with that SNF." 44 Fed.Reg. 9753 (1979).

The 1979 regulations were based on the unpromulgated 1977 regulations.[7] The preamble to the 1979 regulations states that one of the goals of the 1977 regula-

tions was "to clarify the point at which Federal funding of Medicaid payments would cease for a facility that had been terminated from the Medicaid program ... [including] certain provisions relating to the coterminous nature of Medicare and Medicaid provider agreements." 44 Fed. Reg. 9749 (1979). The introduction to the 1977 regulations states that "[w]ith respect to SNF's whose Medicaid participation is predicated upon Medicare certification, existing regulations are *clarified* to specify that the effective date of the Medicare agreement's expiration or cancellation must also be the effective date for expiration or cancellation of the Medicaid agreement." 42 Fed.Reg. 3666 (1977) (emphasis added).

In short, the use of the word "expanded" in the preamble to the 1979 regulation is less important than the rationale underlying the change in the regulation itself. That rationale, as described in the proposed 1977 "clarification" regulations, is this:

The basis for the proposed changes with respect to joint Medicaid-Medicare facilities, is section 1910 of the Act, which provides that facilities certified under [Medicare] are deemed to be certified under [Medicaid]. Consequently a facility's certification status under Medicare determines its status for purposes of a Medicaid provider agreement.

42 Fed.Reg. 3666 (1977).

### III

The district court alternatively held that the Secretary was precluded from seeking recoupment of the allegedly improperly paid Medicaid funds because the Secretary had failed to comply with his own notice procedures. Specifically, the district judge noted that HHS's *Long Term Care Manual* provided "that '[f]ollowing publication [of a notice to the SNF and the public of a nonrenewal decision], formal notice will be made to the State survey agency.'" Order

---

**7.** The 1977 regulations were not promulgated because HHS believed that certain issues related to continuing payments throughout the appeals process had not been adequately addressed in the 1977 Notice of Proposed Rulemaking. HHS intended to address those issues specifically in the 1979 Notice. 44 Fed.Reg. 9749 (1979).

at 5; R.57 at 5. The district judge concluded that, because this "formal notice" was not sent until February 1977—approximately sixteen months after the actual date of the nonrenewal—both the State and Woodstock were prejudiced by their lack of information.

■ We disagree. The alleged HHS breach could have had no adverse effect on either Woodstock or the State. Rather, as we mentioned in our earlier opinion in this case:

> It is conceded that the government informed both Woodstock and the State of Wisconsin on September 25, 1975 of the decertification of Woodstock as an SNF provider under the Medicare program. In addition, the letter informed both parties that Woodstock was no longer eligible as an SNF under the Medicaid program because the requirements of the two programs were identical. Since that time the government has never represented that it would not seek retroactive disallowance.

713 F.2d at 290. Thus, it is clear that both parties had *actual notice* in September 1975 that, as far as HHS was concerned, all Medicare and Medicaid funding would be terminated at the end of October. Notably, this notice was sufficient to incite Woodstock to seek, on October 1, 1975, reconsideration of the Medicare decertification decision. *See* Tr. at 2589. Given these facts, neither Woodstock nor WHSS can argue that it has been prejudiced by the alleged minor breach in this case.

Accordingly, we reverse the judgment of the district court and remand the case for further proceedings.[8]

REVERSED AND REMANDED.

8. We express no opinion concerning Woodstock's due process argument. We leave it to the district court to consider that issue in the first instance.