**MERIDIAN MORTGAGE
CORPORATION,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–278C.**

United States Claims Court.

Jan. 6, 1992.

---

Carl G. Roberts, Philadelphia, Pa., for plaintiff.

Peter G. Barber, with whom were Asst. Attys. Gen. Stuart M. Gerson, David M. Cohen, and Sharon Y. Eubanks, Washington, D.C., for defendant. Edward Eitches, Dept. of Housing and Urban Development; Cynthia Reese and Virginia Rutledge, Dept. of the Treasury, of counsel.

## OPINION

BRUGGINK, Judge.

The pending cross motions for summary judgment raise a novel question concerning the issuance of Federal Housing Administration ("FHA") General Insurance Fund debentures. The precise issue is when debentures first become "outstanding" for purposes of a notice of early redemption. Plaintiff, holder by assignment of rights to receive over $11 million in FHA debentures, claims that since the debentures had not yet been created as paper certificates, but were merely reflected as accounts within the Treasury Department's computer system, they were not subject to a call notice. Defendant takes the opposite view. Approximately six months' interest is at stake. The relevant facts are not disputed. For the following reasons, and after oral argument, the court concludes that defendant's position is correct.

## FACTUAL AND LEGISLATIVE BACKGROUND

Pursuant to section 207 of the National Housing Act of 1937 (the "Act"), 12 U.S.C. § 1713 (1988), in the event of default, a mortgagee on a federally insured rental housing loan can collect the insurance benefits in the form of debentures. *Id.* § 1713(g). Debentures thus issued must be "signed by the Secretary [of HUD], by either his written or engraved signature, shall be negotiable, and shall be dated as of the date of default ... and shall bear interest from such date...." *Id.* § 1713(i).

Under statutory authority,[1] an agreement was developed between HUD and the Department of the Treasury entitled "Pro-

---

1. *See* 12 U.S.C. § 1713(j).

cedure for the Conduct of Transactions by the Treasury Department on Behalf of the Federal Housing Administration in connection with Mutual Insurance Fund and Housing Insurance Fund Debentures and Interim Certificates for Such Debentures". Under the agreement,[2] the Treasury Department acts as agent for HUD, for among other things, the issuance and redemption of debentures. Also pursuant to the agreement,[3] and by practice since 1988, the Federal Reserve Bank of Philadelphia acts as fiscal agent for the Treasury with respect to these types of debentures.

The steps leading to the creation of debentures were outlined in the affidavits of Gary G. Zimmerman[4] and Walter Childs.[5] According to Zimmerman:

> The claim examination process begins with the receipt of fiscal data. The fiscal data is reviewed for the accuracy of the claim. The process includes verifying the mortgage balance, escrow balances, reserve for replacement balances and any special escrow deposit balances....
>
> When all balances are verified and/or adjusted, and notice of legal clearance has been received, the claim is processed for final settlement.
>
> When the necessary paperwork has been prepared, it is sent to the Federal Reserve Bank by overnight mail for the issuance of debentures authorized. The requisition that is sent is the authorization for issuance of the debentures.

Childs picks up the narrative:

> The debentures at issue ... were all issued based on paper schedules transmitted by HUD. After receipt of a schedule at [the Federal Reserve Bank of] Philadelphia and verification of the information thereon, debentures of the requested amount and loan ("CUSIP") are entered into an account for the owner in the FHA debenture system ("sys-

tem"). An "Original Issue Authorization Advice" is produced, verifying that the data has been entered into the system.

Childs Affidavit at ¶ 6.

At this point, once the debenture in the requested amount is entered into the system under the account owner's name, the Treasury Department considers the debenture "registered" to that owner. Childs Supplemental Affidavit at ¶ 2. That determination is derived from two provisions of the "General Regulations Governing U.S. Securities," set out in Title 31, Part 306 of the Code of Federal Regulations. The first provision states that "[a] *registered* security refers to a security the ownership of which is registered on the books of the [Treasury] Department." 31 C.F.R. § 306.-2(n) (1989) (emphasis in original). The second provision states that "[t]he Treasury Department reserves the right to treat the registration as conclusive of ownership." 31 C.F.R. § 306.10.

Childs goes on to describe the post-registration procedures:

> ... The system automatically updates appropriate computer files via a batch process that is effected the evening of the same day the data is manually entered into the system. A "Statement of Account" is generated whenever a transaction occurs, and is mailed to the owner.... The entry of original issue data in the system is a transaction that automatically generates a statement of account. The "Reason(s) for this Statement" shown on such a Statement of Account is "Original issue (OI)." The Statement of Account also shows a description of the owner's holdings as of the date it is generated, and the balance in the account. The transaction date shown on the Statement of Account is the date the original issue transaction

---

**2.** And also by authority of the act. *See* 12 U.S.C. § 391 (1988); 31 C.F.R. § 337.7 (1990).

**3.** *See also* 31 C.F.R. § 337.0 (1990).

**4.** Chief of the Multifamily Claims Branch of the Multifamily Accounting and Servicing Division, United States Department of Housing and Urban Development. He supervises the examina-

tion of financial documents submitted in connection with multifamily claims and authorizes disbursement of debentures.

**5.** Director of the Division of Security Accounts, Office of Securities and Accounting Services, Bureau of the Public Debt, Department of the Treasury.

was processed (entered in the system). The transaction date is also the date the debentures are recorded as part of the outstanding debt of the United States. The Statement of Account also shows a "retro-active interest" amount, which is paid by check upon establishment of the FHA debenture account.... The payments of retro-active interest on the debentures at issue ... were made on September 21, 1989.... Subsequent to the establishment of a debenture account on the FHA system, debenture stock of the appropriate series and denomination is withdrawn from the vault at FRB Philadelphia ... and inscribed with the owner's name, as specified in the HUD schedule. The debenture serial numbers are thereafter entered into the debenture account that has already been established. The debentures are mailed by certified mail to the owner at the address specified on the HUD schedule, unless the owner arranges to pick up the debentures.

Childs Affidavit at ¶ 6 (Citations omitted).

This process was followed with respect to Meridian's debentures. Through assignment and assumption agreements, or through purchase agreements, Meridian had received from three different mortgage companies the rights to receive Series MM 12/01/2007 and 12/01/2008 debentures bearing annual interest at twelve and seven eighths percent when issued. There were three different construction projects involved. The transaction with respect to Stonewood Apartments is representative. After default, the mortgage was assigned to HUD on December 8, 1988. On December 29, the fiscal data was received. On September 12, 1989, the Multifamily Claims Branch ("MCB") completed its review. On September 13, the MCB authorized issuance of debentures in the amount of $2,799,500 and sent an original issue authorization to the FRB for processing. This authorization reflects "Final settlement." On September 20, 1989, the FRB produced an "Original Issue Authorization Advice," indicating the creation of an account within the system. On September 21, a check was issued to the mortgagee for retroactive interest at the debenture rate, commencing as of the date of default.

Debenture certificates were subsequently prepared with respect to the loans at issue. They were finalized in certificate form sometime after September 30 and before October 16, when the certificates were mailed out.

Prior to the creation of the paper certificates, however, on September 26, 1989, the Department of Housing and Urban Development ("HUD") announced a "Notice of Call to Holders of Federal Housing Administration Debentures for Redemption." The notice of call announced the redemption at par value plus accrued interest as of January 1, 1990, of all FHA debentures with coupon rates of 8.5 percent or higher, "outstanding as of September 30, 1989." Because the Department of the Treasury considers any security in "registered" form to be an outstanding obligation as of the date of the original issue (i.e., the creation of the account), plaintiff's debentures were called in by the notice. The notices were sent to Meridian as assignee of debenture rights from the original mortgage companies. The notices themselves did not indicate a debenture certificate number, but referred to the underlying project financed by the HUD guaranteed loan. Also enclosed with the notices were statements of account rendered by the Federal Reserve Bank of Philadelphia. The statements of account gave an account number unique to the insured project, and showed the current balance of the account.

Under protest, and with reservation of rights, plaintiff turned in the certificates, and they were redeemed as of January 1, 1990. An administrative protest of the inclusion of the debentures at issue was rejected, and plaintiff thus filed its complaint here.

Meridian takes the position in its complaint that, until debentures exist in writing, are assigned a certificate number, are inscribed with the signatures of both Secretaries, and are delivered to the registered holders, they are "without legal effect and are not subject to redemption." There is

no question that while a number of steps had taken place leading to the physical creation of debenture certificates, no certificates existed for the relevant debentures as of September 30, 1989. At that time, there was no document that contained the certificate registration number or that was inscribed with the necessary signatures. There had certainly been no delivery. There is also no question, however, that the obligations were more than just a twinkle in the eye of the Secretary of the Treasury. The question before the court is whether they had advanced sufficiently from conception to delivery to be considered "outstanding" for redemption purposes.

## DISCUSSION

The formal requirements for debentures are set out at 12 U.S.C. § 1713(i) and (j). They are to be "executed" in the name of the General Insurance Fund as obligor, signed by the Secretary of HUD (either handwritten or engraved), negotiable, dated as of the date of default, bear interest payable semiannually, tax exempt in certain respects, fully and unconditionally guaranteed, issued in multiples of $50, and shall mature in twenty years, and include a provision for early redemption. They may be in coupon or registered form. The statutory provisions thus give detail both as to the form of a debenture and as to its content.

The practice of treating debentures as outstanding as of entry on the books of the Federal Reserve Bank is based on a longstanding interpretation, but is not captured in a specific regulation. The statutes and regulations at issue simply do not address directly the precise question to be resolved. No definition is given for when a debenture is outstanding for purposes of redemption. Section 207(j) merely recites that the debentures must be subject to a provision for redemption as prescribed by the Secretary of HUD, with approval of the Treasury Department. The applicable regulation does not describe the debts in any way other than as debentures. *See* 24 C.F.R. § 200.159. The issue therefore is whether, given the overall statutory and regulatory framework, the Treasury Department's practice of treating the subject debentures as subject to call prior to issuance of the paper certificate is based on a reasonable construction of these provisions.

Plaintiff argues forcefully that the list of characteristics of a debenture plainly contemplates that they are manifested by inscribed, certified pieces of paper. It is difficult to find fault with that conclusion. Plaintiff goes on to say that until the last step toward physical execution is complete, however, the debenture is inchoate—of no legal effect—and certainly not "outstanding." Treating anything not meeting each of these requirements as a debenture is, according to plaintiff, a breach of contract.

The regulations provide that there are two types of Treasury debentures: definitive securities, which are issued in an engraved or printed form, and book-entry securities, which exist solely on the books and records of the Treasury Department. 31 C.F.R. § 306.115(b)–(d). Plaintiff cites responses to discovery requests wherein the Government admits that the debentures were not book-entry securities, and therefore must have been definitive securities. A definitive security, as defined in the regulations, is a "Treasury bond, note, certificate of indebtedness, or bill issued ... in engraved or printed form." 31 C.F.R. § 306.115(c). Meridian reads into this regulation a requirement that a definitive Treasury security does not come into existence until delivery. As between definitive and book-entry securities, the only difference apparent from the record is that the owners of definitive securities receive certificates denoting their ownership, whereas book-entry owners do not. The benefit derived from owning a definitive security is in the ease by which ownership may be transferred once the certificate is issued.

Since August 1986, all marketable securities, whether classified as definitive or not, have been treated as issued in book-entry form. Childs Affidavit at ¶ 2. The Government explains that these particular securities were not book-entry because the issuing agency, FHA, has not converted to the more convenient and modern methods

used by other issuers. Though the securities in this case were technically of the definitive type, nothing in the regulations prevents the Treasury Department from treating both types of securities the same for accounting purposes.

■ The Government argues that the debentures came into existence upon issuance of the Original Issue Authorization Advice on September 20, 1989, the date which the Government claims the debentures became "registered." Registration is an important event in the process because, under 31 C.F.R. § 306.10, it establishes ownership. Meridian takes issue with the Government's characterization of the September 20 event as registration, however. Meridian points out that the regulations do not define registration. It might be more precise to say that the definition in 31 C.F.R. § 306.2(n) ("[a] *registered* security refers to a security the ownership of which is registered on the books of the [Treasury] Department") is somewhat elliptical. Plaintiff's argument that the Treasury Department's practice is inconsistent with the regulation is therefore not telling. As recited above, the Treasury Department has a long-standing practice of treating debentures as registered from the time they are posted to the Department's bookkeeping system. Given the generality of the statute and the regulations, it was within the Department's province to construe the term "registration" as it did. *See Chevron, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

The need for, and the reasonableness of the Government's construction is further supported by the Treasury Department's practice of considering an obligation outstanding for purposes of calculating the public debt pursuant to 31 U.S.C. § 3101 (1988), as of the date of the Original Issue Authorization Advice. In other words, as of that date, plaintiff's right to receive engraved debentures was, in itself, treated as part of the public debt, thus adding to the legitimacy of treating these obligations as "outstanding" for purposes of early redemption.

Meridian suggests an alternative accounting system whereby the Treasury waits to record the debenture as outstanding until it receives an acknowledgment from the owner that the certificate has been received. That the Treasury would prefer its present system to one so cumbersome is not unreasonable. Moreover, accumulated interest, which runs from date of default at the debenture rate, must accrue to someone. Since even Meridian concedes that its rights to receive interest were transferrable before issuance of the certificates, ownership as of the time of accrual is important.

Meridian also argues that, in any event, registration only serves to settle disputes between different parties claiming ownership of a security. Who owns the security, however (and when ownership attached), is plainly relevant to the issue in this case. Under 31 C.F.R. § 306.10, ownership of the securities vested in Meridian as of the date of registration. 31 C.F.R. § 306.10 (1989) ("The Treasury Department reserves the right to treat the registration as conclusive of ownership."). For ownership to have any relevance, there plainly must be a "res" to which it attaches. That this res was not ephemeral, or was merely an inchoate right, is evidenced by the payment of interest on September 21, 1989.

It is apparent that the degree of concreteness of the debentures may depend on the perspective of the observer. From Meridian's perspective, it does not have a certificate in hand, and thus cannot transfer rights merely by endorsement of the debenture. This is not to say, however, that no rights existed in Meridian as of September 30, or that no obligations resided in the Treasury Department. From the former's perspective, it could execute an assignment agreement prior to the issuance of debenture certificates. From the latter's perspective, after the Original Issue Authorization Advice, the Treasury Department is obligated to pay interest at the debenture rate. In that regard, it is noteworthy that the only dates borne by the certificates later issued are the date of default and the date of maturity. The date the certificate

was executed appears nowhere. Nor is completion of the formalities of execution discretionary. No further acts by Meridian were necessary as of September 30. Nor are the terms of the debenture subject to alteration. They are fixed by regulation. *See* 24 C.F.R. §§ 200.157, 200.158, 200.160. Those terms include a right of redemption on three months' notice.

In short, after the creation of the account on September 20, 1989, events were leading inexorably to the creation of debentures of precisely the character and terms issued in certified form around October 15. But the issuance of those certificates was merely the physical confirmation of a prior existing debt. In that respect, the debentures at issue here are different in kind from those discussed by the Supreme Court in *Young v. Clarendon Township*, 132 U.S. 340, 10 S.Ct. 107, 33 L.Ed. 356 (1889). Plaintiff relies heavily on that case, and another of similar vintage,[6] for the proposition that every formal aspect of issuance must be complete before a debt obligation comes into existence. The Michigan statute enabling the issuance of municipal bonds in that case erected a number of hurdles to the existence of enforceable bonds. After physical creation of the bonds, they had to be delivered to the state Treasurer to be held in escrow until presentation of a certificate from the Governor to the effect that the obligee, a railroad company, had complied with other provisions of law. The Treasurer was to clip interest coupons maturing prior to presentation of the certificate. If the certificate was presented, the Treasurer was to deliver the bond to the railroad company. If a certificate of compliance was not submitted within three years, the bonds were cancelled.

The Court held that the bonds never became enforceable, because they were not delivered by the Treasurer, as required by statute. The Court recites that, "[i]f it be said that such details are useless and technical, a sufficient answer is, so the statute is written; and the courts cannot unmake or modify it." 132 U.S. at 352, 10 S.Ct. at 111. "We hold, therefore, that, since the

bonds were never endorsed and delivered by the treasurer as required by the statute, they never became operative. The act of delivery is essential to the existence of any deed, bond or note." *Id.* at 353, 10 S.Ct. at 111. Two things bear noting about this decision. First, the decision is controlled by the wording of the particular statute, which required delivery: "Too much stress cannot be laid on the necessity of consulting the statute." *Id.* The statute at issue here does not specifically require delivery, and satisfaction of most other terms can occur without the medium of a piece of paper.

This raises the second noteworthy point. The year of issuance of the debentures in this case was the centennial of the *Young* decision. Without in any way questioning the continuing validity of the proposition that the terms of the enabling statute control, the court cannot ignore the exigencies inherent in the present circumstances—exigencies which could not have been contemplated by the Court in *Young*. The Treasury Department is responsible for monitoring the volume of the nation's outstanding debt. It is not remarkable that it uses electronic account-keeping to aid in that process. In commerce today, financial institutions recognize debits and credits, and transfer the same, using in some case exclusively electronic means. Some accounts exist only on computer disks. While there is nothing archaic about requiring the solemnity of certificates, registrations, and signatures to memorialize debts, it is also not surprising that the Treasury Department recognizes the existence of debts before those formalities are completed. Given the enormous volume of the transactions with which it deals, the inherent ambiguity of awaiting a manual act to signal liability, the relative importance of even minor delays in crediting interest, and the relative greater precision of relying on the date of creation of the original issue account, use of that date was reasonable.

The dynamic behind the recall was interest rates. The Treasury Department was paying twelve and seven eighths percent

**6.** *Barnum v. Okolona,* 148 U.S. 393, 395, 13 S.Ct.    638, 639, 37 L.Ed. 495 (1893).

interest on the debentures, which plaintiff claims were not then outstanding, at a time when the Government could borrow at approximately eight or nine percent. The debentures were thus animate from the standpoint of the parameter that mattered most to both parties—the accrual of interest. The court concludes that the Department's actions were neither contrary to law nor a breach of contract.

## CONCLUSION

The Clerk is directed to dismiss the complaint. No costs.