**FURR'S/BISHOP'S CAFETERIAS, L.P., d/b/a Furr's Cafeterias, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent,**

No. 91–9548.

United States Court of Appeals, Tenth Circuit.

Oct. 9, 1992.

Robert P. Tinnen, Jr. (Margaret R. McNett, also of Sherman & Howard, with him on the brief), Albuquerque, N.M., for petitioner.

Karen Fletcher Torstenson, Atty., Office of Immigration Litigation (Stuart M. Gerson, Asst. Atty. Gen., and Robert Kendall, Jr., Asst. Director, with her on the brief), Civ. Div., U.S. Dept. of Justice, Washington, D.C., for respondent.

Betty Southard Murphy, John H.M. Fenix, and Marc D. Flink of Baker & Hostetler, Washington, D.C., and Denver, Colo., of counsel, Richard C. Johnson, National Restaurant Ass'n, Washington, D.C., filed an amicus brief, for the National Restaurant Ass'n.

Before LOGAN, SETH and SNEED,* Circuit Judges.

LOGAN, Circuit Judge.

Furr's/Bishop's Cafeterias, L.P. (Furr's) petitions for review of a decision of the Chief Administrative Hearing Officer of the Executive Office for Immigration Review holding that Furr's is liable for civil penalties as a second-time offender under the Immigration Reform and Control Act of 1986 (IRCA), 8 U.S.C. § 1324a(e)(4)(A)(ii). Jurisdiction in this court is proper under 8 U.S.C. § 1324a(e)(8).

---

* The Honorable Joseph T. Sneed, Senior United States Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

## I

The parties have stipulated to the relevant facts, which we briefly recount. Furr's owns and operates 155 cafeterias and restaurants located throughout the western United States. Their central office, which is responsible for the management of personnel and employee relations, is located in Lubbock, Texas. The central office hires all management personnel for the various cafeterias and promulgates guidelines for the hiring of non-management employees in its "Field Management Manual." It also retains the authority, seldom used, to terminate non-management employees. When the IRCA was enacted, the central office conducted training sessions for its management employees on compliance with the law's requirements.

Below the central office on the Furr's hierarchy are several regional management teams, each assigned a geographic region encompassing several cafeterias. Regional directors have the authority to terminate non-management employees, and occasionally in the past have hired some management employees for cafeterias in their region.

At the local level, each cafeteria is staffed by a general manager, a food and beverage manager, and one or more associate managers. Applications for employment at a particular restaurant are considered by the general manager, who is responsible for the hiring of between forty and eighty non-management personnel for the day-to-day operations of the cafeteria.

In June 1988, Furr's was ordered to pay a $3900 penalty for IRCA violations that occurred at one of its cafeterias in Aurora, Colorado. In August 1988, Furr's was ordered to pay a $5100 penalty for similar violations occurring at its Kansas City, Kansas cafeteria. Each penalty was imposed under the first-time violator provisions of 8 U.S.C. § 1324a(e)(4)(A)(i).

In the instant case, yet another Furr's cafeteria was penalized for the illegal hiring of unauthorized aliens. Furr's admitted liability for the hiring of two undocumented aliens in its Olathe, Kansas cafeteria, and for committing paperwork violations involving fifteen other employees, agreeing to pay a $12,000 fine as a result. Furr's contended, however, that the portion of the fine assessed for the illegal hiring should be administered under the "first level" penalty structure of the IRCA, on the basis that because each violation occurred at separate cafeterias each such offense is a "first" violation for purposes of the IRCA. The government disagreed, claiming that because the Kansas City, Kansas and Olathe, Kansas restaurants are within the same region, and thus under the control of the same regional director, the fine should take cognizance of the prior violation at the Kansas City restaurant and thus be imposed under the "second level" provisions of the IRCA.[1]

The final paragraph of 8 U.S.C. § 1324a(e)(4) provides as follows:

> In applying this subsection in the case of a person or entity composed of distinct, physically separate subdivisions each of which provides separately for the hiring, recruiting, or referring for employment, without reference to the practices of, and not under the control of or common control with, another subdivision, each such subdivision shall be considered a separate person or entity.

Furr's argues that each cafeteria constitutes a separate subdivision for purposes of this section, while the government claims that the common control exercised by the regional managers and central headquarters prevents the application of this section to Furr's individual restaurants.

The administrative law judge (ALJ) found that the cafeterias were not completely independent for purposes of hiring, but rather were under the control of "several levels" of Furr's management. Conse-

---

**1.** Although the parties have agreed that Furr's will pay a $12,000 penalty regardless of whether that penalty is deemed to be imposed under the first or second level of punishment, the appeal is not moot. Furr's has a continuing interest in avoiding being labelled as a repeat offender subject to future penalties of up to $10,000 per illegal alien hired under the third level of punishment.

quently, he deemed second-level fines to be appropriate, and ordered the $12,000 fine to be paid under that provision. On administrative review the Chief Administrative Hearing Officer of the Executive Office for Immigration Review adopted the ALJ's opinion and order as that of the Attorney General. Furr's then filed its petition for review in this court.

## II

■ The issue before us, arising under the final paragraph of 8 U.S.C. § 1324a(e)(4), apparently is a matter of first impression in any court. We must review the Immigration & Naturalization Service's (INS) interpretation for consistency with congressional intent and reasonableness under the circumstances. The proper approach is familiar:

When reviewing an agency's construction of a statute it administers, a court must follow a two-step analysis. First, if Congress has directly spoken to the precise question at issue and its intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron [U.S.A., Inc. v. Natural Resources Defense Council, Inc.]*, 467 U.S. 837, 842–43, 104 S.Ct. [2778] at 2781–82 [81 L.Ed.2d 694]. If Congress has not addressed directly the precise question at issue, the reviewing court "does not simply impose its own construction on the statute.... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnote omitted). In such a case, the agency's construction is permissible unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782.

*Rives v. ICC*, 934 F.2d 1171, 1174 (10th Cir.1991). The standard of review is not altered in situations in which, as here, the interpretation of the statute is performed through adjudication rather than rulemaking. *See Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1496 (D.C.Cir.1988).

■ The IRCA provides for oversight and enforcement by the Attorney General, *see* 8 U.S.C. § 1324a(e), which is exercised by the INS and the Executive Office for Immigration Review. Consequently, because it is charged with administering the statute, the agency's interpretation of the act will be accorded deference if the statute is ambiguous and if the construction is reasonable.

■ The agency interpretation is that to obtain separate entity treatment the statute at issue requires complete separation of the subsidiaries from the parent or another subsidiary with regard to employment and oversight of employment decisions. The ALJ's opinion, adopted by the Attorney General through the Executive Office for Immigration Review, reasoned that "only where subsidiaries are *completely* independent of common control can the parent corporation raise the 'person or entity' limitation as a defense to second level fines." I R. 24. Arguably that is the correct reading of the statute, even without the aid of the deference we must give to agency interpretations under *Chevron.* The section states in positive terms that physically distinct subdivisions which do their own hiring "without reference to the practices of, and not under the control of or common control with, another subdivision" are entitled to separate status for IRCA purposes. 8 U.S.C. § 1324a(e)(4). The agency interpretation merely states the same conclusion negatively, that unless there is complete separation the entities are not treated as distinct from one another.

The illustration in the House Report relied upon by Furr's and the amicus restaurant association does not require a different conclusion. It states:

For example, suppose automaker A has two distinct subdivisions, X and Y. In 1984, subdivision X commits its second violation, i.e., it becomes liable under the first civil fine provision. At that point, automaker A is jointly responsible with X for such liability. In 1985, subdivision Y commits its first violation (which, by defi-

nition, results in a citation only). At that point, automaker A is, like Y, responsible for that violation. However, insofar as A is concerned, the violation by Y is A's first violation. That is to say, the violation by Y is not added to the previous two violations by X to create third stage liability (i.e. a second level fine) for automaker A....

It must be emphasized that this limitation applies only to those situations where the subdivisions of the corporation or entity do their own hiring and recruiting for employment completely independent and irrespective of the other subdivisions.

H.R.Rep. No. 99–682(I), 99th Cong., 2d Sess. 60 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5664. The regulations promulgated under the IRCA essentially parrot the statute itself as relevant to the issue before us:

Where an order is issued with respect to a respondent composed of distinct, physically separate subdivisions which do their own hiring, or their own recruiting or referring for a fee for employment (without reference to the practices of, and under the control of, or common control with another subdivision) the subdivision shall be considered a separate person or entity.

8 C.F.R. § 274a.10(b)(3).

Furr's and the amicus restaurant association argue that affirmance of the Attorney General's ruling would have serious repercussions for the food service industry, which has many employees and much turnover. They argue it might lead to corporations adopting a "hands-off" approach to local employee hiring, thereby hoping to avoid repeat-offender liability under the act. (The government argues that it will have the opposite and good result of encouraging the parent corporations to participate in increasing oversight of the local entities' hiring practices.) Furr's and the amicus also argue that the food industry will quit hiring individuals who look foreign for fear of liability. They want a looser standard, treating the subdivisions as separate entities if they do their own hiring and

recruitment; they say Congress surely did not intend to discourage parent corporations from having general hiring policies. These are arguments that should be addressed to Congress, or at least to the agency; we are convinced that the agency interpretation is a reasonable one entitled to our deference.

We thus turn to the application of the statute to the facts before us. The ALJ and the Attorney General, through the Executive Office for Immigration Review, followed a fact-based inquiry, considering Furr's corporate structure and the degree of autonomy under which its subsidiaries operate. It found that the general employment policies dictated by Furr's central office through the "Field Management Manual," coupled with the specific guidelines relating to compliance with the IRCA, the retained power to terminate unauthorized employees and to discipline managers of individual cafeterias for IRCA violations, and Furr's conduct of company-wide education workshops, demonstrated that Furr's "exercised a significant degree of 'control' over hiring procedures by the individual cafeterias." I R. 24. These findings are not clearly erroneous.

AFFIRMED.