# Relocation Deadline Provision Contained in the 1996 Omnibus Consolidated Rescissions and Appropriations Act

Requirement in the Appropriations Act that the United States Information Agency relocate the Office of Cuba Broadcasting to south Florida by a date almost a month before the Act was signed into law constitutes a technical or typographical error, and USIA is entitled to obligate the funds appropriated in the provision, even though it is unable to turn back the clock and comply with the provision's literal deadline.

May 21, 1996

MEMORANDUM OPINION FOR THE CHAIRMAN
BROADCASTING BOARD OF GOVERNORS

This is in response to your request for advice concerning the interpretation of a provision contained in title IV of the Omnibus Consolidated Rescissions and Appropriations Act, Pub. L. No. 104–134, 110 Stat. 1321, 1321–43 (1996) ("Act") (the provision at issue is herein referred to as "the provision"). *See* Letter for Walter E. Dellinger, Assistant Attorney General, Office of Legal Counsel, from David W. Burke, Chairman, Broadcasting Board of Governors (May 2, 1996). Specifically, you have asked whether the United States Information Agency ("USIA") is entitled at this time to spend monies appropriated under the provision, whether the provision requires the relocation of the Office of Cuba Broadcasting's ("OCB") headquarters to south Florida, and whether the accounts cited in the provision as being available to finance the relocation are currently available for that purpose.

The provision provides a fiscal year 1996 appropriation to USIA to carry out activities authorized under various public laws relating to international broadcasting by the United States. The provision states in pertinent part:

> For expenses necessary to enable the United States Information Agency to carry out the Radio Broadcasting to Cuba Act, as amended, the Television Broadcasting to Cuba Act, and the International Broadcasting Act of 1994 . . . $24,809,000 . . . *Provided, That not later than April 1, 1996, the headquarters of the Office of Cuba Broadcasting shall be relocated from Washington, D.C. to south Florida,* and that any funds available under the headings "International Broadcasting Operations," "Broadcasting to Cuba," and "Radio Construction" may be available to carry out this relocation.

Pub. L. No. 104–134, 110 Stat. at 1321–43 (emphasis added).

As your letter makes clear, because the Act was signed into law on April 26, 1996, almost one month after the date upon which OCB's headquarters must be

209

relocated to south Florida under the literal terms of the provision's relocation deadline, these literal terms cannot be satisfied. For the reasons stated below, however, we conclude that USIA is at this time nevertheless entitled to spend funds appropriated under the provision. In addition, we conclude that the relocation of OCB's headquarters to south Florida is mandatory under the appropriation. Finally, we conclude that, despite USIA's inability to comply with the literal terms of the provision's relocation deadline, it may at this time access funds contained in the International Broadcasting Operations, Broadcasting to Cuba, and Radio Construction accounts in order to cover expenses associated with relocating OCB's headquarters to south Florida. These conclusions are premised on observance of the statutory mandate to relocate OCB's headquarters to south Florida. We decline to address at this time, however, the time period within which the relocation must be accomplished.

## I. Discussion

The pre-eminent principle of statutory interpretation, as most recently expressed by the Supreme Court, is that where Congress has "spoken to the precise question at issue," agencies and courts are bound by the terms of the statute as written. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). Here, the appropriations provision under review speaks plainly and precisely, imposing an April 1, 1996 deadline on the relocation of OCB's headquarters to south Florida. We conclude, however, that the exceptional aspects of this provision and its enactment history justify a narrow exception to the principle enunciated in *Chevron* to correct what manifestly appears to be a technical or clerical error.

According to a General Accounting Office ("GAO") treatise on Appropriations law:

> A statute may occasionally contain what is clearly a technical or typographical error which, if read literally, could alter the meaning of the statute or render execution effectively impossible. In such a case, if the legislative intent is clear, the intent will be given effect over the erroneous language.

1 Office of the General Counsel, United States General Accounting Office, *Principles of Federal Appropriations Law* 2–74 (2d ed. 1991). Courts have embraced the GAO's view regarding such statutes. In *Fleming v. Salem Box Co.*, 38 F. Supp. 997 (D. Or. 1940), the court gave effect to what it determined to be the true intent of Congress when confronted with a clerical error that, if adhered to, could not have been reconciled with the statute's legislative history. The court stated that "[a] palpable clerical error clearly shown should not override legisla-

tive intention." *Id.* at 998. In *Ronson Patents Corp. v. Sparklets Devices, Inc.,* 102 F. Supp. 123 (E.D. Mo. 1951), the court determined that a statute extending the term of a patent was not invalid despite the existence of an error in the patent's reissue date. According to the court, "if the error in a legislative act is apparent on the face of the act and can be corrected by other language of the act, it is not fatal." *Id.* at 124.[1] The fact that the provision's literal terms require USIA to satisfy a condition that is beyond the realm of possibility strongly suggests that the provision contains an error of the type contemplated by the "technical or clerical error" line of cases.

The "technical or clerical error" doctrine directs courts, when necessary, to look beyond a statute's literal language to the statute's legislative history to fashion an interpretation that is consistent with Congress's intention in passing the statute. We will, therefore, attempt such an exercise with respect to the provision's April 1, 1996 relocation deadline. Our research reveals that Senator Gramm initially introduced the requirement that OCB's headquarters be relocated to south Florida by April 1, 1996 as an amendment to the Senate's version of H.R. 2076, the Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1996. 141 Cong. Rec. S14,539–40 (daily ed. Sept. 28, 1995).[2] On September 28, 1995, the same day the amendment was introduced, it was incorporated by unanimous consent into the version of H.R. 2076 then pending before the Senate. *Id.* at S14,540. On the following day, September 29, 1995, the Senate passed its version of H.R. 2076, as amended. *Id.* at S14,697 (daily ed. Sept. 29, 1995).

A slightly modified version of Senator Gramm's amendment emerged from conference with the House of Representatives, *see* 141 Cong. Rec. H13,885 (daily ed. Dec. 4, 1995), and was included in the version of H.R. 2076 that was passed by both houses of Congress on December 6 and 7, 1995. *Id.* at H14,112 (daily ed. Dec. 6, 1995); *id.* at S18,182–83 (daily ed. Dec. 7, 1995). The relocation language that emerged from conference and was approved by both houses as part of H.R. 2076 was identical to the relocation language contained in the provision. In describing the relocation language that emerged from the conference on H.R. 2076, the joint explanatory statement on the conference agreement stated:

---

[1] Although the Supreme Court has not had an occasion to review a decision regarding technical or clerical errors of this kind, it has acknowledged that *Chevron's* teaching with regard to the literal meaning of a statute is subject to some exceptions. Recognizing in *Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 510 (1989), that a literal interpretation of Fed. R. Evid. 609(a)(1) would cause an "unfathomable" result (i.e., the "den[ial to] a civil plaintiff [of] the same right to impeach an adversary's testimony that [the rule] grants to a civil defendant"), it held that the rule should be read in a manner consistent with Congress's intention in enacting it, which requires that the word "defendant" be interpreted to refer solely to "criminal" defendants. 490 U.S. at 521.

[2] The amendment introduced by Senator Gramm modified H.R. 2076 to add the following language to the section appropriating funds for Broadcasting to Cuba:

". *Provided further,* That not later than April 1, 1996, the headquarters of the Office of Cuba Broadcasting shall be relocated from Washington, D.C. to south Florida, and that any funds available to the United States Information Agency may be available to carry out this relocation."

*Id.* at S14,558.

The conference agreement includes $24,809,000 for Broadcasting to Cuba under a separate account, as proposed by the Senate, instead of within the total for International Broadcasting Operations, as proposed by the House.

The agreement also includes language requiring the relocation of the headquarters of the Office of Cuba Broadcasting from Washington, D.C., to south Florida by April 1, 1996, and permits funds from three accounts, International Broadcasting Operations, Broadcasting to Cuba, and Radio Construction, to be used to carry out the relocation. The Senate bill proposed the relocation, but allowed any USIA funds to be used to carry out the relocation. The House bill contained no similar provision.

141 Cong. Rec. H13,923 (daily ed. Dec. 4, 1995); H.R. Conf. Rep. No. 104–378, at 148–49 (1995).

Because the President vetoed H.R. 2076, *see* 141 Cong. Rec. D1491 (daily ed. Dec. 19, 1995), and Congress was unable to override his veto, H.R. 2076 was never enacted. Subsequently Congress and the President reached agreement on the bulk of the fiscal year 1996 appropriations that were originally included in H.R. 2076, and these appropriations and other provisions from H.R. 2076 were included in H.R. 3019. H.R. 3019 contained H.R. 2076's relocation language, with no adjustment in the relocation date. On April 25, 1996, the House and Senate passed H.R. 3019 with this language in it, including the April 1, 1996 relocation deadline, *see* 142 Cong. Rec. 9141 (1996); *id.* at 9218, and President Clinton signed it on April 26, 1996. *See* 142 Cong. Rec. D386 (daily ed. Apr. 29, 1996).

On the basis of the original passage of H.R. 2076 on December 6 and 7, 1995, Congress intended OCB's headquarters to be relocated to south Florida, was willing to allow funds contained in USIA's International Broadcasting Operations, Broadcasting to Cuba, and Radio Construction accounts to finance the relocation, and was prepared to allow approximately four months for the relocation to be accomplished. The retention of the relocation and related language in H.R. 3019 indicates that Congress's intention as to the relocation and its financing had not changed in the intervening period between December, 1995 and the passage of H.R. 3019, and there is no other evidence of any kind to suggest that it had changed. The manifest intention of Congress, thus, is that OCB's headquarters be relocated by *some* date, that the relocation be financed through the USIA accounts specified above, and that the relocation be a condition on the expenditure of certain appropriated funds. Under these circumstances, we believe the retention of the April 1, 1996 relocation deadline—compliance with which had become a temporal impossibility by the provision's date of enactment—was the result

of a technical error in failing to revise the relocation deadline prior to the passage of H.R. 3019.

Finally, in many other cases of correcting a technical or clerical error, a substitute for the erroneous term is obvious or apparent from the context. *Cf. Appropriations to Pay Supervisiors of Election*, 1 Comp. Dec. 1 (1894) (holding that an appropriation providing funds in connection with an election held on November "5th," 1890 could be used to make payments associated with an election held on November 4, 1890, where it was clear that November "5th" was a typographical error and Congress intended to make the funds available to support the November 4 election). Here, several plausible alternatives seem available. In this circumstance, we leave to USIA, the agency administering the appropriation in the first instance, the responsibility for determining a compliance date that is consistent with Congress's intention.

## II. *Conclusion*

Based on the foregoing, we conclude that USIA is entitled at this time to obligate the funds appropriated in the provision, even though it is unable to turn back the clock and comply with the provision's literal deadline for relocating OCB's headquarters to south Florida. We also conclude that the relocation of OCB's headquarters to south Florida is mandatory under the appropriation. Finally, we conclude that USIA may use funds available under the account headings specified in the provision to finance the relocation.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*