Justice Scalia,
with whom The Chief Justice, Justice Thomas, and Justice Alito join, dissenting.
I join The Chief Justice’s opinion in full, and would hold that this Court has no jurisdiction to decide this case because petitioners lack standing. The Court having decided otherwise, it is appropriate for me to note my dissent on the merits.
I
A
The provision of law at the heart of this case is § 202(a)(1) of the Clean Air Act (CAA or Act), which provides that the Administrator of the Environmental Protection Agency (EPA) “shall by regulation prescribe... standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.” 42 U. S. C. § 7521(a)(1) (emphasis added). As the Court recognizes, the statute “conditionfs] the exercise of EPA’s authority on its formation of a ‘judgment.’” Ante, at 532. There is no dispute that the Administrator has made no such judgment in this case. See ante, at 534 (“We need not and do not reach the question whether on remand EPA must make an endangerment finding”); 68 Fed. Reg. 52929 (2003) (“[N]o Administrator has made a finding under any of the CAA’s regulatory provisions that C02 meets the applicable statutory criteria for regulation”).
The question thus arises: Does anything require the Administrator to make a “judgment” whenever a petition for rulemaking is filed? Without citation of the statute or any other authority, the Court says yes. Why is that so? When *550 Congress wishes to make private action force an agency’s hand, it knows how to do so. See, e. g., Brock v. Pierce County, 476 U. S. 253, 254-255 (1986) (discussing the Comprehensive Employment and Training Act (CETA), 92 Stat. 1926, 29 U.S.C. § 816(b) (1976 ed., Supp. V), which “provided] that the Secretary of Labor ‘shall’ issue a final determination as to the misuse of CETA funds by a grant recipient within 120 days after receiving a complaint alleging such misuse”). Where does the CAA say that the EPA Administrator is required to come to a decision on this question whenever a rulemaking petition is filed? The Court points to no such provision because none exists.
Instead, the Court invents a multiple-choice question that the EPA Administrator must answer when a petition for rulemaking is filed. The Administrator must exercise his judgment in one of three ways: (a) by concluding that the pollutant does cause, or contribute to, air pollution that endangers public welfare (in which case EPA is required to regulate); (b) by concluding that the pollutant does not cause, or contribute to, air pollution that endangers public welfare (in which case EPA is not required to regulate); or (c) by “provid[ing] some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether” greenhouse gases endanger public welfare, ante, at 533 (in which case EPA is not required to regulate).
I am willing to assume, for the sake of argument, that the Administrator’s discretion in this regard is not entirely unbounded — that if he has no reasonable basis for deferring judgment he must grasp the nettle at once. The Court, however, with no basis in text or precedent, rejects all of EPA’s stated “policy judgments” as not “amount[ing] to a reasoned justification,” ante, at 533-534, effectively narrowing the universe of potential reasonable bases to a single one: Judgment can be delayed only if the Administrator concludes that “the scientific uncertainty is [too] profound.” Ante, at 534. The Administrator is precluded from concluding for other reasons “that it would ... be better not to regulate *551 at this time.” Ibid.[1] Such other reasons — perfectly valid reasons — were set forth in the Agency’s statement.
“We do not believe ... that it would be either effective or appropriate for EPA to establish [greenhouse gas] standards for motor vehicles at this time. As described in detail below, the President has laid out a comprehensive approach to climate ehange that calls for near-term voluntary actions and incentives along with programs aimed at reducing scientific uncertainties and encouraging technological development so that the government may effectively and efficiently address the climate change issue over the long term.
“[Establishing [greenhouse gas] emission standards for U. S. motor vehicles at this time would . . . result in an inefficient, piecemeal approach to addressing the climate change issue. The U. S. motor vehicle fleet is one of many sources of [greenhouse gas] emissions both here and abroad, and different [greenhouse gas] emission sources face different technological and financial challenges in reducing emissions. A sensible regulatory scheme would require that all significant sources and sinks of [greenhouse gas] emissions be considered in deciding how best to achieve any needed emission reductions.
“Unilateral EPA regulation of motor vehicle [greenhouse gas] emissions could also weaken U. S. efforts to persuade developing countries to reduce the [greenhouse gas] intensity of their economies. Considering the large populations and growing economies of some developing countries, increases in their [greenhouse gas] emissions could quickly overwhelm the effects of [green *552 house gas] reduction measures in developed countries. Any potential benefit of EPA regulation could be lost to the extent other nations decided to let their emissions significantly increase in view of U. S. emissions reductions. Unavoidably, climate change raises important foreign policy issues, and it is the President’s prerogative to address them.” 68 Fed. Reg. 52929-52931 (footnote omitted).
The Court dismisses this analysis as “resting] on reasoning divorced from the statutory text.” Ante, at 532. “While the statute does condition the exercise of EPA’s authority on its formation of a ‘judgment,’. . . that judgment must relate to whether an air pollutant ‘cause[s], or contribute[s] to, air pollution which may reasonably be anticipated to endanger public health or welfare.’” Ante, at 532-533. True but irrelevant. When the Administrator makes a judgment whether to regulate greenhouse gases, that judgment must relate to whether they are air pollutants that “cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.” 42 U. S. C. § 7521(a)(1). But the statute says nothing at all about the reasons for which the Administrator may defer making a judgment — the permissible reasons for deciding not to grapple with the issue at the present time. Thus, the various “policy” rationales, ante, at 533, that the Court criticizes are not “divorced from the statutory text,” ante, at 532, except in the sense that the statutory text is silent, as texts are often silent about permissible reasons for the exercise of agency discretion. The reasons EPA gave are surely considerations executive agencies regularly take into account (and ought to take into account) when deciding whether to consider entering a new field: the impact such entry would have on other Executive Branch programs and on foreign policy. There is no basis in law for the Court’s imposed limitation.
EPA’s interpretation of the discretion conferred by the statutory reference to “its judgment” is not only reasonable, *553 it is the most natural reading of the text. The Court nowhere explains why this interpretation is incorrect, let alone why it is not entitled to deference under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). As the Administrator acted within the law in declining to make a “judgment” for the policy reasons above set forth, I would uphold the decision to deny the rulemaking petition on that ground alone.
B
Even on the Court’s own terms, however, the same conclusion follows. As mentioned above, the Court gives EPA the option of determining that the science is too uncertain to allow it to form a “judgment” as to whether greenhouse gases endanger public welfare. Attached to this option (on what basis is unclear) is an essay requirement: “If,” the Court says, “the scientific uncertainty is so profound that it precludes EPA from making a reasoned judgment as to whether greenhouse gases contribute to global warming, EPA must say so.” Ante, at 534. But EPA has said precisely that — and at great length, based on information contained in a 2001 report by the National Research Council (NRC) entitled Climate Change Science: An Analysis of Some Key Questions:
“As the NRC noted in its report, concentrations of [greenhouse gases (GHGs)] are increasing in the atmosphere as a result of human activities (pp. 9-12). It also noted that ‘[a] diverse array of evidence points to a warming of global surface air temperatures’ (p. 16). The report goes on to state, however, that ‘[b]ecause of the large and still uncertain level of natural variability inherent in the climate record and the uncertainties in the time histories of the various forcing agents (and particularly aerosols), a [causal] linkage between the buildup of [GHGs] in the atmosphere and the observed climate changes during the 20th century, cannot be unequivocally established. The fact that the *554 magnitude of the observed warming is large in comparison to natural variability as simulated in climate models is suggestive of such a linkage, but it does not constitute proof of one because the model simulations could be deficient in natural variability on the decadal to century time scale’ (p. 17).
“The NRC also observed that ‘there is considerable uncertainty in current understanding of how the climate system varies naturally and reacts to emissions of [GHGs] and aerosols’ (p. 1). As a result of that uncertainty, the NRC cautioned that ‘current estimate of the magnitude of future warming should be regarded as tentative and subject to future adjustments (either upward or downward).’ Id. It further advised that ‘[Reducing the wide range of uncertainty inherent in current model predictions of global climate change will require major advances in understanding and modeling of both (1) the factors that determine atmospheric concentrations of [GHGs] and aerosols and (2) the so-called “feedbacks” that determine the sensitivity of the climate system to a prescribed increase in [GHGs].’ Id.
“The science of climate change is extraordinarily complex and still evolving. Although there have been substantial advances in climate change science, there continue to be important uncertainties in our understanding of the factors that may affect future climate change and how it should be addressed. As the NRC explained, predicting future climate change necessarily involves a complex web of economic and physical factors including: Our ability to predict future global anthropogenic emissions of GHGs and aerosols; the fate of these emissions once they enter the atmosphere (e. g., what percentage are absorbed by vegetation or are taken up by the oceans); the impact of those emissions that remain in the atmosphere on the radiative properties of the atmos *555 phere; changes in critically important climate feedbacks (e. g., changes in cloud cover and ocean circulation); changes in temperature characteristics (e.g., average temperatures, shifts in daytime and evening temperatures); changes in other climatic parameters (e. g., shifts in precipitation, storms); and ultimately the impact of such changes on human health and welfare (e.g., increases or decreases in agricultural productivity, human health impacts). The NRC noted, in particular, that ‘[t]he understanding of the relationships between weather/climate and human health is in its infancy and therefore the health consequences of climate change are poorly understood’ (p. 20). Substantial scientific uncertainties limit our ability to assess each of these factors and to separate out those changes resulting from natural variability from those that are directly the result of increases in anthropogenic GHGs.
“Reducing the wide range of uncertainty inherent in current model predictions will require major advances in understanding and modeling of the factors that determine atmospheric concentrations of [GHGs] and aerosols, and the processes that determine the sensitivity of the climate system.” 68 Fed. Reg. 52930.
I simply cannot conceive of what else the Court would like EPA to say.
II
A
Even before reaching its discussion of the word “judgment,” the Court makes another significant error when it concludes that “§ 202(a)(1) of the Clean Air Act authorizes EPA to regulate greenhouse gas emissions from new motor vehicles in the event that it forms a ‘judgment’ that such emissions contribute to climate change.” Ante, at 528 (emphasis added). For such authorization, the Court relies on *556 what it calls “the Clean Air Act’s capacious definition of ‘air pollutant.’” Ante, at 532.
“Air pollutant” is defined by the Act as “any air pollution agent or combination of such agents, including any physical, chemical, . . . substance or matter which is emitted into or otherwise enters the ambient air.” 42 U. S. C. § 7602(g). The Court is correct that “[c]arbon dioxide, methane, nitrous oxide, and hydrofluorocarbons,” ante, at 529, fit within the second half of that definition: They are “physical, chemical,... substance[s] or matter which [are] emitted into or otherwise ente[r] the ambient air.” But the Court mistakenly believes this to be the end of the analysis. In order to be an “air pollutant” under the Act’s definition, the “substance or matter [being] emitted into . . . the ambient air” must also meet the first half of the definition — namely, it must be an “air pollution agent or combination of such agents.” The Court simply pretends this half of the definition does not exist.
The Court’s analysis faithfully follows the argument advanced by petitioners, which focuses on the word “including” in the statutory definition of “air pollutant.” See Brief for Petitioners 13-14. As that argument goes, anything that follows the word “including” must necessarily be a subset of whatever precedes it. Thus, if greenhouse gases qualify under the phrase following the word “including,” they must qualify under the phrase preceding it. Since greenhouse gases come within the capacious phrase “any physical, chemical, . .. substance or matter which is emitted into or otherwise enters the ambient air,” they must also be “air pollution agent[s] or combination^] of such agents,” and therefore meet the definition of “air pollutant[s].”
That is certainly one possible interpretation of the statutory definition. The word “including” can indeed indicate that what follows will be an “illustrative” sampling of the general category that precedes the word. Federal Land Bank of St Paul v. Bismarck Lumber Co., 314 U. S. 95, 100 *557 (1941). Often, however, the examples standing alone are broader than the general category, and must be viewed as limited in light of that category. The Government provides a helpful (and unanswered) example: “The phrase ‘any American automobile, including any truck or minivan,’ would not naturally be construed to encompass a foreign-manufactured [truck or] minivan.” Brief for Federal Respondent 34. The general principle enunciated — that the speaker is talking about American automobiles — carries forward to the illustrative examples (trucks and minivans), and limits them accordingly, even though in isolation they are broader. Congress often uses the word “including” in this manner. In 28 U. S. C. § 1782(a), for example, it refers to “a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.” Certainly this provision would not encompass criminal investigations underway in a domestic tribunal. See also, e. g., 2 U. S. C. § 54(a) (“The Clerk of the House of Representatives shall, at the request of a Member of the House of Representatives, furnish to the Member, for official use only, one set of a privately published annotated version of the United States Code, including supplements and pocket parts”); 22 U. S. C. § 2304(b)(1) (“the relevant findings of appropriate international organizations, including nongovernmental organizations”).
In short, the word “including” does not require the Court’s (or the petitioners’) result. It is perfectly reasonable to view the definition of “air pollutant” in its entirety: An air pollutant can be “any physical, chemical, . . . substance or matter which is emitted into or otherwise enters the ambient air,” but only if it retains the general characteristic of being an “air pollution agent or combination of such agents.” This is precisely the conclusion EPA reached: “[A] substance does not meet the CAA definition of ‘air pollutant’ simply because it is a ‘physical, chemical, . . . substance or matter which is emitted into or otherwise enters the ambient air.’ It must *558 also be an ‘air pollution agent.’ ” 68 Fed. Reg. 52929, n. 3. See also id., at 52928 (“The root of the definition indicates that for a substance to be an ‘air pollutant,’ it must be an ‘agent’ of ‘air pollution’ ”). Once again, in the face of textual ambiguity, the Court’s application of Chevron deference to EPA’s interpretation of the word “including” is nowhere to be found.[2] Evidently, the Court defers only to those reasonable interpretations that it favors.
B
Using (as we ought to) EPA’s interpretation of the definition of “air pollutant,” we must next determine whether greenhouse gases are “agent[s]” of “air pollution.” If so, the statute would authorize regulation; if not, EPA would lack authority.
Unlike “air pollutants,” the term “air pollution” is not itself defined by the CAA; thus, once again we must accept EPA’s interpretation of that ambiguous term, provided its interpretation is a “permissible construction of the statute.” Chevron, 467 U. S., at 843. In this case, the petition for rule-making asked EPA for “regulation of [greenhouse gas] emissions from motor vehicles to reduce the risk of global climate change.” 68 Fed. Reg. 52925. Thus, in deciding whether it had authority to regulate, EPA had to determine whether the concentration of greenhouse gases assertedly responsible for “global climate change” qualifies as “air pollution.” EPA began with the commonsense observation that the “[problems associated with atmospheric concentrations *559 of C02,” id., at 52927, bear little resemblance to what would naturally be termed “air pollution”:
“EPA’s prior use of the CAA’s general regulatory provisions provides an important context. Since the inception of the Act, EPA has used these provisions to address air pollution problems that occur primarily at ground level or near the surface of the earth. For example, national ambient air quality standards (NAAQS) established under CAA section 109 address concentrations of substances in the ambient air and the related public health and welfare problems. This has meant setting NAAQS for concentrations of ozone, carbon monoxide, particulate matter and other substances in the air near the surface of the earth, not higher in the atmosphere. . . . C02, by contrast, is fairly consistent in concentration throughout the world’s atmosphere up to approximately the lower stratosphere.” Id., at 52926-52927.
In other words, regulating the buildup of C02 and other greenhouse gases in the upper reaches of the atmosphere, which is alleged to be causing global climate change, is not akin to regulating the concentration of some substance that is polluting the air.
We need look no further than the dictionary for confirmation that this interpretation of “air pollution” is eminently reasonable. The definition of “pollute,” of course, is “[t]o make or render impure or unclean.” Webster’s New International Dictionary 1910 (2d ed. 1949). And the first three definitions of “air” are as follows: (1) “[t]he invisible, odorless, and tasteless mixture of gases which surrounds the earth”; (2) “[t]he body of the earth’s atmosphere; esp., the part of it near the earth, as distinguished from the upper rarefied part”; (3) “[a] portion of air or of the air considered with respect to physical characteristics or as affecting the *560 senses.” Id., at 54. EPA’s conception of “air pollution”— focusing on impurities in the “ambient air” “at ground level or near the surface of the earth” — is perfectly consistent with the natural meaning of that term.
In the end, EPA concluded that since “CAA authorization to regulate is generally based on a finding that an air pollutant causes or contributes to air pollution,” 68 Fed. Reg. 52928, the concentrations of C02 and other greenhouse gases allegedly affecting the global climate are beyond the scope of CAA’s authorization to regulate. “[T]he term ‘air pollution’ as used in the regulatory provisions cannot be interpreted to encompass global climate change.” Ibid. Once again, the Court utterly fails to explain why this interpretation is incorrect, let alone so unreasonable as to be unworthy of Chevron deference.
* *
The Court’s alarm over global warming may or may not be justified, but it ought not distort the outcome of this litigation. This is a straightforward administrative-law case, in which Congress has passed a malleable statute giving broad discretion, not to us but to an executive agency. No matter how important the underlying policy issues at stake, this Court has no business substituting its own desired outcome for the reasoned judgment of the responsible agency.

 The Court’s way of putting it is, of course, not quite accurate. The issue is whether it would be better to defer the decision about whether to exercise judgment. This has the effect of deferring regulation but is quite a different determination.

 Not only is EPA’s interpretation reasonable, it is far more plausible than the Court’s alternative. As the Court correctly points out, “all airborne compounds of whatever stripe,” ante, at 529, would qualify as “physical, chemical,... substance[s] or matter which [are] emitted into or otherwise ente[r] the ambient air,” 42 U. S. C. § 7602(g). It follows that everything airborne, from Frisbees to flatulence, qualifies as an “air pollutant.” This reading of the statute defies common sense.